# LAWRENCE

## vs.

## METROPOLITAN GOVERNMENT OF NASHVILLE

# JAMIE SUMMERS

## April 24, 2023



## Linder Reporting, LLC
### Sarah N. Linder, LCR
### (615) 415-7764
### Sarahnlinder@gmail.com

```
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE MIDDLE DISTRICT OF TENNESSEE
 2                             AT NASHVILLE
   _____
 3
   MAGGIE LAWRENCE,
 4
               Plaintiff,
 5
   vs.                       Case No.:  3:22-cv-0680
 6
   METROPOLITAN GOVERNMENT OF
 7 NASHVILLE & DAVIDSON COUNTY,
   acting by and through THE
 8 NASHVILLE FIRE DEPARTMENT,
 9               Defendant.
   _____
10
11
12
13
14
15                         Deposition of:
16                         JAMIE SUMMERS
17                         Taken on behalf of the Plaintiff
                           April 24, 2023
18
19
20
21
22 _____
23                       Linder Reporting, LLC
                         Sarah N. Linder, LCR
24                       437 Wellington Square
                        Nashville, Tennessee 37214
25                          (615)415-7764
```

```
 1
 2              A P P E A R A N C E S
 3

 4
   For the Plaintiff:
 5
                MR. ROBERT C. BIGELOW
 6              Attorney at Law
                Bigelow Law, PLLC
 7              4235 Hillsboro Pike, Suite 301
                Nashville, TN  37215
 8              (615)829-8986
                Rbigelow@bigelowlegal.com
 9

10

11 For the Defendant:

12              MR. BENJAMIN A. PUCKETT
                Assistant Metropolitan Attorney
13              The Department of Law of the Metropolitan
                 Government of Nashville and Davidson County
14              P.O. Box 196300
                Nashville, TN  37219
15              (615)862-6341
                Benjamin.puckett@nashville.gov
16

17

18 Also Present:

19              MS. MAGGIE LAWRENCE

20

21

22

23

24

25
```

                    I  N  D  E  X

                                                    Page
Examination
By Mr. Bigelow                                        5




                    E  X  H  I  B  I  T  S

                                                    Page
Exhibit No. 1                                         13
        Position Statement of the Metropolitan
        Government of Nashville and Davidson
        County
Exhibit No. 2                                         13
        Maggie Lawrence's Personnel File

Exhibit No. 3                                         56
        E-mail from Al Thomas to William Swann
        and Others Dated 7/3/2019 - Subject:
        Community Risk Assessment Goals
        With Attachments

Exhibit No. 4                                         56
        Complaint

```
 1              S T I P U L A T I O N S

 2

 3

 4           The deposition of JAMIE SUMMERS was taken by

 5      counsel for the Plaintiff, at the Nashville Fire

 6      Department, 63 Hermitage Avenue, Nashville,

 7      Tennessee, on April 24, 2023, for all purposes under

 8      the Federal Rules of Civil Procedure.

 9           All formalities as to caption, notice,

10      statement of appearance, et cetera, are waived.  All

11      objections, except as to the form of the questions,

12      are reserved to the hearing, and that said deposition

13      may be read and used in evidence in said cause of

14      action in any trial thereon or any proceeding herein.

15           It is agreed that SARAH N. LINDER, LCR,

16      Notary Public and Court Reporter for the State of

17      Tennessee, may swear the witness, and that the

18      reading and signing of the completed deposition by

19      the witness was not discussed.

20

21

22

23

24

25
```

```
1                      *   *   *
2                 JAMIE SUMMERS,
3  was called as a witness, and having first been duly
4  sworn, testified as follows:
5
6                    EXAMINATION
7  QUESTIONS BY MR. BIGELOW:
8  Q.      Good morning, Ms. Summers.              08:58:00
9  A.      Morning.                                08:58:01
10 Q.      If you would, just state your name for the  08:58:02
11 record.                                         08:58:04
12 A.      Jamie Summers.                          08:58:04
13 Q.      And what's your current address, Ms. Summers?  08:58:06
14 A.      5053 Brakeman Court, and that's         08:58:09
15 B-R-A-K-E-M-A-N, Pegram, Tennessee 37143.       08:58:17
16 Q.      And what do you do for a living?        08:58:21
17 A.      I'm the human resources manager at the  08:58:24
18 Nashville Fire Department.                      08:58:26
19 Q.      How long have you been doing that?      08:58:27
20 A.      I've been in human resources with Metro 08:58:28
21 government for 25 years in September.  I've been here  08:58:30
22 for 11 years next month.                        08:58:33
23 Q.      Have you given a deposition before?     08:58:34
24 A.      I have.                                 08:58:36
25 Q.      Okay.  Then what I'm about to tell you  08:58:37
```

| | | |
|---|---|---|
| 1 | probably isn't news to you, but just few ground | 08:58:40 |
| 2 | rules -- | 08:58:44 |
| 3 | A.      Sure. | 08:58:45 |
| 4 | Q.      -- at least for when I give -- take | 08:58:45 |
| 5 | depositions.  First, tell the truth.  Obviously, | 08:58:47 |
| 6 | you've already sworn to do that. | 08:58:51 |
| 7 |          Second is if I say something too quickly or | 08:58:53 |
| 8 | if you don't understand it, please let me know.  Is | 08:58:57 |
| 9 | that okay? | 08:59:00 |
| 10 | A.      It's perfect. | 08:59:01 |
| 11 | Q.      Third, if you ever need a break for any | 08:59:02 |
| 12 | reason, just tell me, hey, I need a break and we'll | 08:59:05 |
| 13 | take a break. | 08:59:09 |
| 14 | A.      Sounds good. | 08:59:09 |
| 15 | Q.      What is your role as the HR manager? | 08:59:10 |
| 16 | A.      So my role is to oversee the personnel -- | 08:59:15 |
| 17 | day-to-day personnel issues at the fire department, | 08:59:20 |
| 18 | things like a payroll; not the payroll part of it but | 08:59:26 |
| 19 | the human resources related payroll:  Leave, time | 08:59:29 |
| 20 | accounting, getting the file ready for payroll to go. | 08:59:32 |
| 21 | That runs under my employees, Michelle.  I've got | 08:59:35 |
| 22 | four people that work for me.  We do all the FMLA, | 08:59:39 |
| 23 | short-term disability, onboarding for all the new | 08:59:42 |
| 24 | hires, paperwork for everybody that's leaving. | 08:59:46 |
| 25 |          I oversee the disciplinary process here. | 08:59:48 |

```
 1          In addition to onboarding, then we do all --        08:59:53
 2   in conjunction with the central human resources, all       08:59:56
 3   the recruitment from promotions are run centrally          08:59:59
 4   through us, but by rule, they have to be signed off        09:00:05
 5   on and so we kind of do that together with central         09:00:08
 6   human resources.                                            09:00:12
 7          I oversee the disciplinary process if I             09:00:12
 8   haven't said that yet.  I don't -- I'm not a               09:00:15
 9   decisionmaker in those, but I ensure that the rules        09:00:18
10   are followed and anything else that -- you know, that      09:00:21
11   employees need from a personal stand- -- you know,         09:00:24
12   their file -- their employee files.  I've got a           09:00:27
13   little piece in the records management, work               09:00:32
14   centrally with central human resources on class comp       09:00:36
15   and benefit issues, IODs, anything Civil Service           09:00:38
16   related.  That's just a little bit of it.                  09:00:43
17   Q.     So it's a huge job?                                 09:00:45
18   A.     I think so, yes.                                    09:00:47
19   Q.     Right.  It sounds like it.  What are your          09:00:48
20   hours?                                                      09:00:50
21   A.     I -- my standard hours are 7:30 to 4, but I        09:00:51
22   work whenever Chief needs me to work.                      09:00:54
23   Q.     Okay.  One of the things that I believe you        09:00:57
24   said in your answer was you oversee disciplinary           09:01:00
25   processes.  Is that correct?                               09:01:04
```

```
 1   A.      Correct.                                              09:01:05

 2   Q.      How does that work?  Can you explain that for         09:01:06

 3   me?                                                           09:01:10

 4   A.      So each division Chief or Commander,                  09:01:10

 5   depending on what area, if they've got issues with            09:01:15

 6   their employees -- and I'll use suppression for an            09:01:18

 7   example or op- -- fire operations, they have an               09:01:22

 8   employee who's violated a rule or policy.                     09:01:24

 9           Let's just say they had a back -- an accident         09:01:26

10   backing a fire engine and they didn't have a ground           09:01:28

11   guide.  Then they -- the chief of that area, Chief            09:01:32

12   Tomlinson, Chief Tony, depending on whoever's                 09:01:34

13   bringing that up, will meet with the employee, get            09:01:37

14   the background, see if -- we've kind of got this              09:01:40

15   standard:  Most people back without a ground guide,           09:01:43

16   unless it's extenuating circumstances, get a                  09:01:47

17   three-day suspension.  They'll offer the employee             09:01:49

18   three days.                                                   09:01:51

19           If the employee doesn't take that time, then          09:01:51

20   we'll have a disciplinary panel and then I administer         09:01:54

21   that panel.  I make sure we've got three members              09:01:56

22   here.  The employee's put on notice with their                09:01:58

23   charges, their -- bring their union rep, or their             09:02:00

24   legal representative, whatever they want in here, and         09:02:04

25   then they have their hearing, which is just an                09:02:07
```

| | |
|---|---|
| 1 | informal hearing where the panel gets to ask | 09:02:10 |
| 2 | questions and the employee gets to make their | 09:02:13 |
| 3 | statement regarding those -- regarding those charges. | 09:02:15 |
| 4 | And then the panel makes recommendation to | 09:02:17 |
| 5 | Chief Swann, and Chief Swann will then determine | 09:02:20 |
| 6 | whatever discipline he wants.  And then depending on | 09:02:23 |
| 7 | who it is, sometimes I'll write up those letters. | 09:02:26 |
| 8 | Other times, that chief will.  And then we get it | 09:02:30 |
| 9 | back to that employee and then I oversee the Civil | 09:02:32 |
| 10 | Service piece of if the employee appeals that | 09:02:35 |
| 11 | disciplinary process. | 09:02:39 |
| 12 | Q.     Do you deal with claims of discrimination? | 09:02:41 |
| 13 | A.     I do. | 09:02:43 |
| 14 | Q.     How does that work? | 09:02:43 |
| 15 | A.     Well, it just depends on how the employee | 09:02:45 |
| 16 | feels to -- going about that claim.  They have the | 09:02:48 |
| 17 | right to come through their chain of command.  They | 09:02:50 |
| 18 | can come directly to me.  They can go directly to | 09:02:53 |
| 19 | human resources.  They can go straight to the EEOC. | 09:02:57 |
| 20 | And so, just depending on how the employee does those | 09:03:01 |
| 21 | charges depends on my involvement, but I usually work | 09:03:04 |
| 22 | as the liaison with Metro Legal to write responses to | 09:03:08 |
| 23 | those. | 09:03:12 |
| 24 | Q.     Do you write responses to EEOC charges? | 09:03:12 |
| 25 | A.     I'll write draft responses -- | 09:03:15 |

| | | |
|---|---|---|
| 1 | Q.    You -- okay. | 09:03:17 |
| 2 | A.    -- with the facts of the case surrounding the | 09:03:17 |
| 3 | employee as I know them if I'm aware of them.  And | 09:03:21 |
| 4 | then I work hand in hand with Metro Legal on that. | 09:03:23 |
| 5 | Q.    Okay.  Do you do the same for the complaints | 09:03:26 |
| 6 | as well, like actual complaints filed in court? | 09:03:29 |
| 7 | A.    Yes. | 09:03:31 |
| 8 | Q.    Okay.  I'm going to hand you and your counsel | 09:03:31 |
| 9 | the position statement of the Metro Government of | 09:03:45 |
| 10 | Nashville and Davidson County with regards to Ms. | 09:03:50 |
| 11 | Lawrence.  Are you familiar with that document? | 09:03:56 |
| 12 | A.    Yes. | 09:03:58 |
| 13 | Q.    Okay.  I want to turn your attention -- well, | 09:03:58 |
| 14 | did you help draft this document or did you draft | 09:04:08 |
| 15 | this response? | 09:04:11 |
| 16 | A.    I had input into it.  I didn't draft the | 09:04:11 |
| 17 | final response, but I did help work with Metro Legal | 09:04:14 |
| 18 | in drafting it, yes. | 09:04:17 |
| 19 | Q.    Okay.  Is there anyone outside of -- I don't | 09:04:18 |
| 20 | want to talk about what Metro Legal did necessarily. | 09:04:21 |
| 21 | I -- but within your department, is there anyone else | 09:04:25 |
| 22 | who helped Metro Legal with this? | 09:04:28 |
| 23 | A.    No. | 09:04:30 |
| 24 | Q.    Okay.  At the bottom of page 1, top of page | 09:04:30 |
| 25 | 2, the charge states:  On October 8th, 2021, less | 09:04:46 |

| | | |
|---|---|---|
| 1 | than a -- one month after filing my EEOC charge, now | 09:04:49 |
| 2 | Fire Marshal Hutchison put me on a performance | 09:04:56 |
| 3 | improvement plan.  The stated reasons for this were | 09:05:00 |
| 4 | varied and not legitimate.  For example, he claimed | 09:05:03 |
| 5 | that I did not assign a former employee's recall | 09:05:05 |
| 6 | duties to anyone, even though I did. | 09:05:08 |
| 7 | He also said that I approved overtime for | 09:05:10 |
| 8 | employees that should not have been approved. | 09:05:13 |
| 9 | However, he was the person who told me to approve | 09:05:16 |
| 10 | this overtime.  I have documentation to support all | 09:05:20 |
| 11 | of these statements. | 09:05:25 |
| 12 | And then there is a response to that | 09:05:27 |
| 13 | underneath, correct? | 09:05:29 |
| 14 | A.      Correct. | 09:05:31 |
| 15 | Q.      I want to focus on both what I just read and | 09:05:31 |
| 16 | then the response.  What did you do to research your | 09:05:37 |
| 17 | response? | 09:05:45 |
| 18 | A.      So I would -- some of this, I just had direct | 09:05:46 |
| 19 | knowledge of because -- like, especially in Number 1 | 09:05:52 |
| 20 | about the original PIP because I worked with Chief | 09:05:55 |
| 21 | Thomas on that so I knew -- or Fire Marshal Thomas, | 09:06:00 |
| 22 | I'm sorry, so I knew what was going on with that one. | 09:06:06 |
| 23 | The issues on Number 2 with the TeleStaff, | 09:06:10 |
| 24 | those were dealing directly with my employees so I | 09:06:14 |
| 25 | knew about those issues as well.  And then I -- | 09:06:17 |

```
 1   specifically -- so -- and then on the deficiencies,        09:06:23
 2   Number 3 and 4, those would have come from                  09:06:27
 3   information from Fire Marshal Hutchison.                     09:06:30
 4   Q.      Okay.  You mentioned the original PIP,              09:06:35
 5   correct?                                                    09:06:39
 6   A.      Correct.                                            09:06:39
 7   Q.      PIP, performance improvement plan.  And this       09:06:40
 8   position statement that was filed by Metro states          09:06:46
 9   that Ms. Lawrence was originally put on a PIP by the        09:06:50
10   previous fire marshal, Allison Thomas, who went by         09:06:54
11   Al, correct?                                                09:06:59
12   A.      Correct.                                            09:06:59
13   Q.      Are you in charge of personnel files?              09:07:04
14   A.      I am.                                               09:07:08
15   Q.      Okay.  And would a PIP go in a personnel           09:07:08
16   file?                                                       09:07:15
17   A.      It should.                                          09:07:15
18   Q.      It should?                                          09:07:16
19   A.      It should.                                          09:07:17
20   Q.      Okay.  Did Ms. Lawrence's PIP go in -- from        09:07:17
21   Al Thomas go in her personnel file?                        09:07:27
22   A.      I do not know.                                      09:07:29
23   Q.      Okay.  I'm gonna hand you --                       09:07:31
24           MR. BIGELOW:  Actually, could we mark             09:07:34
25   what I initially gave, the position statement, as          09:07:35
```

| | | |
|---|---|---|
| 1 | Exhibit 1, please? | 09:07:39 |
| 2 | (WHEREUPON, the above-mentioned document | 09:07:50 |
| 3 | was marked as Exhibit Number 1.) | 09:07:51 |
| 4 | BY MR. BIGELOW: | 09:07:51 |
| 5 | Q.    And this is rather large, but it is marked | 09:07:51 |
| 6 | MG, I guess Metro Government, 1 through 334.  And I'm | 09:07:55 |
| 7 | gonna hand you that, which I'd like ultimately marked | 09:08:07 |
| 8 | as Exhibit 2, please. | 09:08:10 |
| 9 | A.    You want me to take this out? | 09:08:12 |
| 10 | Q.    Please. | 09:08:14 |
| 11 | (WHEREUPON, the above-mentioned document | 09:08:18 |
| 12 | was marked as Exhibit Number 2.) | 09:08:22 |
| 13 | THE WITNESS:  Well... | 09:08:22 |
| 14 | BY MR. BIGELOW: | 09:08:22 |
| 15 | Q.    And I know this is a little unorthodox and I | 09:08:23 |
| 16 | apologize for this, but I'm gonna ask you just to | 09:08:26 |
| 17 | kind of flip through that -- I know it's relatively | 09:08:29 |
| 18 | long -- and see if there is any PIP, the PIP we were | 09:08:32 |
| 19 | talking about, from -- the alleged PIP from Al Thomas | 09:08:38 |
| 20 | to Ms. Lawrence that is included in her personnel | 09:08:41 |
| 21 | file. | 09:08:53 |
| 22 | A.    Do you know if this is in order by date or do | 09:08:53 |
| 23 | we know or how -- | 09:08:56 |
| 24 | MR. PUCKETT:  I don't know. | 09:08:56 |
| 25 | THE WITNESS:  -- just how we sent -- | 09:08:56 |

```
 1          MR. PUCKETT:  We probably just Bates        09:08:57
 2   stamped in order of how we received it,            09:08:59
 3   unfortunately.                                     09:09:04
 4          THE WITNESS:  (Reviews document.)  My       09:10:21
 5   goodness.  I know these -- I don't know what these 09:10:23
 6   are because there is -- was this glitch in our image 09:12:49
 7   system at one point where you have to open it up in a 09:12:55
 8   different kind of program or software for older    09:12:59
 9   documents.                                         09:13:03
10   BY MR. BIGELOW:                                    09:13:03
11   Q.     So just -- just let --                      09:13:03
12   A.     I don't think that's them.                  09:13:04
13   Q.     Let me just stop you just for a second to be 09:13:05
14   clear.                                             09:13:05
15   A.     Sure.                                       09:13:05
16   Q.     For the court reporter, when you say I don't 09:13:09
17   know what these are, there are, I believe, three or 09:13:12
18   four documents, maybe a few more that are just     09:13:13
19   completely black --                                09:13:16
20   A.     Yeah.                                       09:13:16
21   Q.     -- where you can't read them.  So just let  09:13:17
22   the record reflect -- is that correct, ma'am?      09:13:20
23   A.     Correct.                                    09:13:20
24   Q.     Okay.                                       09:13:21
25          MR. PUCKETT:  I could read Bates numbers    09:13:21
```

|    |                                                          |          |
|----|----------------------------------------------------------|----------|
| 1  | if you'd like.                                           | 09:13:21 |
| 2  | MR. BIGELOW:  Sure.                                      | 09:13:24 |
| 3  | MR. PUCKETT:  So it looks like Bates                    | 09:13:24 |
| 4  | number MG 0000188 consecutive through --                | 09:13:27 |
| 5  | MR. BIGELOW:  There's more three or four.               | 09:13:30 |
| 6  | My apologies.  Is that right?                           | 09:13:34 |
| 7  | MR. PUCKETT:  -- MG 0000193.                            | 09:13:36 |
| 8  | THE WITNESS:  Okay.  So which perform- --               | 09:15:58 |
| 9  | am I looking for the original from Chief Thomas --      | 09:15:59 |
| 10 | BY MR. BIGELOW:                                         | 09:15:59 |
| 11 | Q.    Yes, ma'am.                                       | 09:16:04 |
| 12 | A.    -- or Al Thomas?                                  | 09:16:04 |
| 13 | Q.    Yep.                                              | 09:16:06 |
| 14 | A.    Al.  Okay.                                        | 09:16:07 |
| 15 | Q.    Which is the one I'm -- the first one --          | 09:16:09 |
| 16 | A.    Right.                                            | 09:16:11 |
| 17 | Q.    -- that was cited, yes, ma'am.                    | 09:16:11 |
| 18 | A.    No, it's not in here.                             | 09:16:12 |
| 19 | Q.    Okay.  Should it be in here?                      | 09:16:16 |
| 20 | A.    Yes, it should.                                   | 09:16:18 |
| 21 | Q.    Are your offices in this building?                | 09:16:19 |
| 22 | A.    They are.                                         | 09:16:19 |
| 23 | Q.    How -- how -- would you be able to quickly        | 09:16:21 |
| 24 | pull up from your computer or wherever, the system,    | 09:16:24 |
| 25 | the performance improvement plan that Al Thomas        | 09:16:27 |

```
 1   allegedly gave my client?                                    09:16:33

 2   A.      I can find -- I can get the e-mail that he            09:16:34

 3   sent, yes.                                                    09:16:39

 4   Q.      I'm looking for the performance --                    09:16:39

 5   A.      Yeah.  It'll be in the e-mail --                      09:16:41

 6   Q.      That --                                               09:16:41

 7   A.      -- he had sent.                                       09:16:44

 8   Q.      That'd be great.  Could I -- could you get a          09:16:44

 9   copy of that?  Can we just take like --                      09:16:44

10   A.      Sure.                                                 09:16:44

11   Q.      -- a ten-minute break?                                09:16:44

12   A.      Fine.                                                 09:16:44

13   Q.      Do you think that's sufficient enough time?          09:16:49

14   A.      Yes, absolutely.                                      09:16:51

15   Q.      Okay.  Would the e-mail have the performance          09:16:52

16   improvement plan attached?                                    09:16:56

17   A.      It will.                                              09:16:56

18   Q.      Okay.  Great.                                         09:16:57

19   A.      Yeah.                                                 09:16:58

20           THE WITNESS:  Do you want me to stop now?             09:16:58

21           MR. BIGELOW:  Yeah.  We can take a break              09:16:58

22   for a few minutes?                                            09:17:03

23           MR. PUCKETT:  Sure.                                   09:17:03

24           (Short break.)                                        09:19:31

25   BY MR. BIGELOW:                                               09:22:38
```

| | |
|---|---|
| 1 | Q.     Okay.  Ms. Summers, you just handed me a | 09:22:38 |
| 2 | document that I'm going to ultimately be asked to be | 09:22:42 |
| 3 | -- | 09:22:42 |
| 4 |             MR. BIGELOW:  Exhibit Number 3? | 09:22:49 |
| 5 |             THE REPORTER:  Uh-huh. | 09:22:51 |
| 6 |             (WHEREUPON, the above-mentioned document | 09:22:52 |
| 7 | was marked as Exhibit Number 3.) | 09:22:57 |
| 8 | BY MR. BIGELOW: | 09:22:57 |
| 9 | Q.     And it is a -- well, what is the document? | 09:22:58 |
| 10 | A.     So this is an e-mail that was sent to Chief | 09:23:00 |
| 11 | Swann and Chief Henderson, copied me, outlining Al | 09:23:05 |
| 12 | Thomas's community risk reduction goals.  And the | 09:23:11 |
| 13 | attachments were in the e-mail that he sent with a | 09:23:14 |
| 14 | performance plan for Deputy Fire Marshal Maggie | 09:23:18 |
| 15 | Lawrence, and then the plan is attached with that. | 09:23:24 |
| 16 | So they were technically two documents:  The Word | 09:23:26 |
| 17 | document for the performance period and then the | 09:23:29 |
| 18 | performance plan attached to it as well. | 09:23:31 |
| 19 | Q.     Okay.  We're gonna delve into these documents | 09:23:34 |
| 20 | in a minute, but I will just note for the record, you | 09:23:37 |
| 21 | would agree that in just the last minute, you said | 09:23:41 |
| 22 | the word performance plan a couple times, correct? | 09:23:44 |
| 23 | A.     Yes. | 09:23:48 |
| 24 | Q.     But you never said the words performance | 09:23:49 |
| 25 | improvement plan? | 09:23:51 |

```
 1   A.      I did not say that, no.                        09:23:51

 2   Q.      But, yet, in page 2 of Metro's position        09:23:52

 3   statement, it's stated that Ms. Lawrence was put on a   09:24:00

 4   performance improvement plan, correct?                  09:24:03

 5   A.      Correct.                                        09:24:05

 6   Q.      So that's not true, is it?                      09:24:05

 7   A.      Well, that's what -- that's what this           09:24:08

 8   document is minus the word improvement.  It's still     09:24:11

 9   the plan that was to be carried out of taking this      09:24:14

10   community risk reduction and assessment, if you will,   09:24:21

11   or -- and the requirements that he wanted her to        09:24:25

12   fulfill.  So I don't know -- I would consider this a    09:24:27

13   performance improvement plan because, otherwise,        09:24:32

14   what -- I don't -- I don't -- I don't really see any    09:24:34

15   difference to be honest with you.                       09:24:37

16   Q.      Okay.  Well, let's delve into that.             09:24:39

17   A.      Okay.                                           09:24:39

18   Q.      You just said a second ago these are the        09:24:41

19   requirements that he wanted her to fulfill, correct?    09:24:44

20   A.      Correct.                                        09:24:46

21   Q.      So it's going forwards, correct?  He -- these   09:24:46

22   are things he wanted to fulfill in the future,          09:24:49

23   correct?                                                09:24:53

24   A.      I would assume that was his plan, yes.          09:24:53

25   Q.      But it's not deficiencies that she didn't       09:24:55
```

| | | |
|---|---|---|
| 1 | fulfill in the past, correct? | 09:24:59 |
| 2 | A.     I would assume that's correct. | 09:25:00 |
| 3 | Q.     Okay.  Because a performance improvement plan | 09:25:02 |
| 4 | addresses deficiencies from the past, correct? | 09:25:04 |
| 5 | A.     Correct. | 09:25:08 |
| 6 | Q.     Okay. | 09:25:09 |
| 7 | A.     If -- can I make a statement with that? | 09:25:10 |
| 8 | Q.     Absolutely. | 09:25:12 |
| 9 | A.     So this is a requirement by the State that | 09:25:12 |
| 10 | didn't exist, so it was required from the past and we | 09:25:15 |
| 11 | didn't have one.  And so that was what they were -- | 09:25:19 |
| 12 | and why we didn't have one, I have no idea if it's | 09:25:23 |
| 13 | been required by the State in order to move forward. | 09:25:28 |
| 14 | So I think that was the reason we used the word | 09:25:30 |
| 15 | improvement. | 09:25:35 |
| 16 | Q.     Is the word improvement on any of this? | 09:25:36 |
| 17 | A.     I'd have to read through it but I don't -- | 09:25:39 |
| 18 | Q.     Sure. | 09:25:39 |
| 19 | A.     -- think so. | 09:25:40 |
| 20 | Q.     Okay.  In fact, let's go through this page by | 09:25:41 |
| 21 | page. | 09:25:44 |
| 22 | A.     Okay. | 09:25:44 |
| 23 | Q.     So page 1 is an e-mail from Al Thomas to | 09:25:44 |
| 24 | Chief Swann, Mr. Henderson and where you are cc'ed, | 09:25:49 |
| 25 | correct? | 09:25:55 |

```
 1    A.      Correct.                                    09:25:55

 2    Q.      And the subject is community risk assessment 09:25:55

 3    goals, correct?                                     09:25:59

 4    A.      Yes.                                         09:26:00

 5    Q.      And the e-mail notes these two documents     09:26:00

 6    outline a one-year plan to conduct a community risk  09:26:04

 7    assessment with a goal of producing a community risk 09:26:09

 8    reduction plan.  The focus is to look at the         09:26:13

 9    historical data for causes of fire, the Taylor public 09:26:16

10    education programs that target the highest number of 09:26:20

11    causes, along with the demographic groups that are  09:26:23

12    affected most.  In other words, present programs to  09:26:27

13    educate the members of the community who are most at 09:26:30

14    risk and reduce the highest number of instances.     09:26:35

15            Maggie Lawrence will be evaluated on these   09:26:39

16    goals and I'm charging her with creating the same    09:26:44

17    type of evaluation for Mike and Jason.  Is that      09:26:47

18    correct?                                             09:26:51

19    A.      Correct.                                     09:26:51

20    Q.      So at the end of his e-mail to Chief Swann,  09:26:52

21    Mr. Henderson, and to you, he notes Maggie Lawrence  09:26:57

22    will be evaluated on these goals, correct?           09:27:02

23    A.      Correct.                                     09:27:05

24    Q.      So it's not we're looking backwards and that 09:27:05

25    we're -- she screwed up and that she has to improve  09:27:11
```

```
 1  something; it's looking forwards, correct?              09:27:14
 2  A.      Correct.                                        09:27:17
 3  Q.      And, in fact, Al Thomas, the former chief,      09:27:17
 4  says I'm charging her with creating the same type of    09:27:21
 5  evaluation for Mike and Jason, correct?                 09:27:26
 6  A.      That's what it says, yes.                       09:27:29
 7  Q.      So when he writes creating the same type of     09:27:30
 8  evaluation, this is an outline of a plan, again,        09:27:35
 9  moving forwards.  Would you agree with that?            09:27:41
10  A.      Yes.                                            09:27:43
11  Q.      Okay.  Do you see how that's different than a   09:27:43
12  performance improvement plan?                           09:27:48
13  A.      I could see how, yes.                           09:27:48
14  Q.      Do you think it's the same thing as a           09:27:50
15  performance improvement plan?                           09:27:52
16  A.      Well, I don't know how to answer that           09:27:53
17  question because we use a lot of just the standard      09:27:59
18  language.  But I could see in your question of what     09:28:04
19  are we trying to improve versus what we're trying to    09:28:06
20  create if that's the question.                          09:28:10
21  Q.      Do you have a form for a performance            09:28:13
22  improvement plan within the fire department?            09:28:17
23  A.      Not a -- not a standard form.  Everybody does   09:28:19
24  something a little bit different; just depends on who   09:28:22
25  the supervisor is.  Some people put them in Word        09:28:24
```

| | | |
|---|---|---|
| 1 | documents like this.  Some people actually use the | 09:28:28 |
| 2 | evaluation that's attached.  Some of them are used | 09:28:31 |
| 3 | connected to reprimand, if you will.  It just depends | 09:28:34 |
| 4 | on who the -- because there's not a standardized | 09:28:35 |
| 5 | performance improvement plan, no. | 09:28:39 |
| 6 | Q.      Is this connected to a reprimand? | 09:28:40 |
| 7 | A.      This is not, no. | 09:28:42 |
| 8 | Q.      Okay.  In fact, there's no reprimand at all | 09:28:42 |
| 9 | in this, is there? | 09:28:44 |
| 10 | A.      No. | 09:28:45 |
| 11 | Q.      Okay.  So there's no performance in this that | 09:28:45 |
| 12 | needs to be improved, is there? | 09:28:48 |
| 13 | A.      Not that I can see. | 09:28:50 |
| 14 | Q.      Okay.  So based on that, it's fair to say | 09:28:51 |
| 15 | this is not what you would consider to be a | 09:28:54 |
| 16 | performance improvement plan, correct? | 09:28:57 |
| 17 | A.      Not based on what's written, no. | 09:28:58 |
| 18 | Q.      Okay.  So, again, in the response to -- in | 09:29:00 |
| 19 | Metro's position statement, it states that Ms. | 09:29:14 |
| 20 | Lawrence was originally put on a performance | 09:29:17 |
| 21 | improvement plan by Fire Marshal Al Thomas; that's | 09:29:22 |
| 22 | not correct, would you agree with that? | 09:29:23 |
| 23 | A.      The way it's written, no. | 09:29:25 |
| 24 | Q.      So you would agree with that? | 09:29:27 |
| 25 | A.      The way this is written, I do not -- this | 09:29:30 |

```
 1    wouldn't -- if you want to use the word improvement        09:29:33

 2    was not included in this plan, no.                          09:29:36

 3    Q.      So you agree that that's not correct?               09:29:38

 4    A.      Correct.                                            09:29:42

 5    Q.      Okay.  In fact, in July of 2019, Fire Marshal       09:29:42

 6    Thomas restructured the organization, didn't he, if        09:29:54

 7    you recall?                                                 09:29:59

 8    A.      I don't recall.                                     09:30:01

 9    Q.      Okay.  Do you recall if they changed -- if          09:30:01

10    Fire Marshal Thomas changed the title of two deputies       09:30:05

11    with Ms. Lawrence's title being changed to fire and         09:30:08

12    life safety community outreach and development?             09:30:12

13    A.      I do not know that, no.                             09:30:17

14    Q.      Okay.  If that were true, would that make           09:30:19

15    this make more sense?                                       09:30:21

16    A.      Possibly.  I -- we only -- that would be a          09:30:25

17    functioning title, which I wouldn't use or would be         09:30:28

18    used in part of my human resources because of -- in         09:30:31

19    my role.  Does that make sense?  So --                      09:30:34

20    Q.      Sure.                                               09:30:35

21    A.      -- whatever -- you know, that would be like         09:30:35

22    my people saying I'm the human resource -- my               09:30:37

23    official title's executive administrator but I go by        09:30:39

24    human resources director.  I don't -- in essence, it       09:30:43

25    didn't change my job.  It's just -- it's an easier          09:30:46
```

```
 1  title to say because the other one doesn't -- you        09:30:49
 2  know, people don't use that so.                          09:30:51
 3  Q.      At the end of this e-mail that Al Thomas          09:30:55
 4  wrote, he states that he's charging Maggie with          09:30:57
 5  creating the same type evaluation for Mike and Jason;    09:31:03
 6  is that correct?                                          09:31:09
 7  A.      Correct.                                          09:31:09
 8  Q.      So would you agree then that this was the        09:31:09
 9  kind of game plan moving forwards for Maggie Lawrence    09:31:17
10  and that Maggie Lawrence was charged with creating       09:31:26
11  the same type of thing for Mike and Jason?               09:31:28
12  A.      Correct.                                          09:31:31
13  Q.      Okay.  So Mike and Jason -- when Maggie did      09:31:31
14  that, if she did that, Mike and Jason weren't            09:31:34
15  receiving a performance improvement plan; they were     09:31:39
16  just receiving a here are your kind of job duties        09:31:41
17  moving forwards, correct?                                09:31:45
18  A.      I would -- yes.  But I thought all along this    09:31:46
19  was their job duties.  I didn't think this was           09:31:50
20  anything new.  That was -- I do know that Maggie was     09:31:53
21  over what we called -- what's the word that they use     09:31:56
22  in here -- life safety or that area of -- in -- and      09:31:59
23  that's -- Mike and Jason were in her area.  So I         09:32:03
24  don't -- wouldn't consider that a restructuring.         09:32:07
25  They already worked for her, I thought, unless          09:32:11
```

```
 1  something changed that I wasn't aware of.                    09:32:14
 2  Q.      Okay.  On the fourth page, you'll note that          09:32:15
 3  there it says at the top of the performance plan,            09:32:22
 4  rating period -- and this is towards the right.  It          09:32:26
 5  says rating period, July '19, through July 1st, 2020,        09:32:30
 6  correct?                                                     09:32:35
 7  A.      Correct.                                             09:32:36
 8  Q.      And then underneath that, it says:  Employee         09:32:36
 9  name, Maggie Lawrence; supervisor name, Al Thomas,           09:32:41
10  Fire Marshal.  And in the kind of black box                  09:32:46
11  underneath that, it says:  Please complete this form         09:32:49
12  to indicate the employer's -- employee's -- I'm              09:32:52
13  sorry -- major job responsibilities, performance            09:32:57
14  goals, and developmental goals for the upcoming year.        09:32:58
15  So it's looking forwards for the upcoming year,              09:33:02
16  correct?                                                     09:33:05
17  A.      Right.                                               09:33:07
18  Q.      The employee's performance on these                  09:33:07
19  components will be evaluated at the end of the year          09:33:08
20  on the performance evaluation form.  During the year,        09:33:12
21  the employee should be given performance feedback on         09:33:17
22  these components.  Feedback should include                   09:33:20
23  communication between the employee and the supervisor       09:33:24
24  on the progress of the employee's performance and may        09:33:26
25  also serve as an opportunity to modify any goals or          09:33:29
```

| | |
|---|---|
| 1 | responsibilities.  Did I read that correctly? | 09:33:33 |
| 2 | A.     You did. | 09:33:35 |
| 3 | Q.     And then underneath that, it says major job | 09:33:36 |
| 4 | responsibilities and it gives five different job | 09:33:39 |
| 5 | responsibilities, correct? | 09:33:43 |
| 6 | A.     Yes. | 09:33:44 |
| 7 | Q.     Okay.  And on the next page, it states -- | 09:33:44 |
| 8 | there's a section that says goal setting; is that | 09:33:51 |
| 9 | correct? | 09:33:54 |
| 10 | A.     Yes. | 09:33:54 |
| 11 | Q.     And there are performance goals, and then | 09:33:54 |
| 12 | there are actions, and then there are benefits, | 09:33:58 |
| 13 | correct? | 09:34:02 |
| 14 | A.     Yes. | 09:34:02 |
| 15 | Q.     So that's saying, hey, in the next however | 09:34:03 |
| 16 | many days, if it's specified, you need to get these | 09:34:07 |
| 17 | things done, correct? | 09:34:11 |
| 18 | A.     Yes. | 09:34:13 |
| 19 | Q.     Okay. | 09:34:13 |
| 20 | A.     Am I supposed to give this to her now? | 09:34:28 |
| 21 | Q.     Please. | 09:34:41 |
| 22 | A.     Okay. | 09:34:41 |
| 23 | Q.     On page 2 of that same position statement of | 09:34:42 |
| 24 | Metro, kind of under the part where it says Ms. | 09:34:48 |
| 25 | Lawrence was originally put on a performance | 09:34:51 |

1    improvement plan by Fire Marshal Al Thomas, it talks

2    about that it was brought to the attention that the

3    fire -- by the State fire marshal that the Nashville

4    Fire Department does not have an accurate CRR plan;

5    is that correct?

6    A.       Yes.                                              09:35:16

7    Q.       And that's community risk reduction plan?         09:35:16

8    A.       Yes.                                              09:35:21

9    Q.       What is a CRR plan, do you know?                  09:35:21

10   A.       I do not.                                         09:35:24

11   Q.       Okay.  Who brought it to Nashville Fire           09:35:25

12   Department's attention that they don't have an            09:35:31

13   accurate CRR plan?                                        09:35:33

14   A.       I do not know.                                    09:35:35

15   Q.       On that same page, it says:  Ms. Lawrence         09:35:45

16   never completed the tasks under the PIP issued by the     09:35:47

17   previous fire marshal.  Again, there was no PIP           09:35:51

18   issued by the previous fire marshal, correct?            09:35:54

19   A.       Just the plan, the performance plan, yes.        09:35:56

20   Q.       So, in fact, it specifically says -- and         09:36:02

21   I'm -- it's kind of towards the bottom of the            09:36:04

22   paragraph where -- labeled 1, number 1, quote:  Ms.      09:36:08

23   Lawrence never completed the tasks under the PIP         09:36:13

24   issued by the previous fire marshal, comma, so Fire      09:36:16

25   Marshal Hutchison needed to place her on another PIP     09:36:21

| | | |
|---|---|---|
| 1 | to get this task completed. Did I read that | 09:36:23 |
| 2 | correctly? | 09:36:26 |
| 3 | A. You did. | 09:36:27 |
| 4 | Q. Okay. And then in 2, it says that Ms. | 09:36:27 |
| 5 | Lawrence had issues with the TeleStaff program; is | 09:36:31 |
| 6 | that correct? | 09:36:35 |
| 7 | A. Yeah. Continuing issues, yes. | 09:36:35 |
| 8 | Q. Continuing issues. She failed to approve or | 09:36:37 |
| 9 | enter employees' time and attendance correctly in | 09:36:42 |
| 10 | TeleStaff, correct? | 09:36:46 |
| 11 | A. Correct. | 09:36:46 |
| 12 | Q. Do you know anything about that? | 09:36:47 |
| 13 | A. I do. | 09:36:49 |
| 14 | Q. Okay. Can you tell me about that. | 09:36:49 |
| 15 | A. So TeleStaff is our time and attendance | 09:36:51 |
| 16 | program that we use here -- software here with | 09:36:55 |
| 17 | Nashville Fire Department. So every employee's | 09:36:59 |
| 18 | listed in there with their just regular duty day. | 09:37:00 |
| 19 | And then any time that is adjusted, whether it's | 09:37:04 |
| 20 | overtime, leave, a holdover, a working out of class, | 09:37:06 |
| 21 | or any kind of thing that it's gonna affect payroll | 09:37:09 |
| 22 | that somebody needs to be paid for is entered into | 09:37:14 |
| 23 | this system, and we have cut-off dates. And we have | 09:37:16 |
| 24 | cut-off dates so that payroll can properly get the | 09:37:21 |
| 25 | information. They can extract that data and put it | 09:37:23 |

```
 1   on people's paychecks.                                        09:37:25

 2        And so on multiple issues, multiple times, we            09:37:27

 3   had issues with the time the employees were not --            09:37:31

 4   either worked overtime and it wasn't entered.  So the         09:37:35

 5   supervisors have to enter overtime -- we can't enter          09:37:39

 6   our own overtime.  It's for check and balances so             09:37:42

 7   that somebody doesn't go in and say, oh, I worked,            09:37:45

 8   you know, six hours and you really didn't.  The               09:37:47

 9   supervisor either -- I guess depending on what area           09:37:50

10   it's in, somebody enters that time for them.                  09:37:53

11   Sometimes it's automatic if we do callbacks; other            09:37:55

12   times, the supervisors have to do it.                         09:37:59

13        And then -- so in order for us to get payroll            09:38:01

14   ready, we have to lock out TeleStaff, which means             09:38:03

15   nobody can touch anything.  Well, if that doesn't get         09:38:06

16   done on time, then we have to wait to the next                09:38:09

17   paycheck.  Then it requires somebody to get retro            09:38:13

18   paid or my staff's got to stop what they're doing,           09:38:15

19   open TeleStaff, get that time -- I mean, it's all a          09:38:19

20   timing issue.  We have to get our stuff done so               09:38:21

21   payroll can get their stuff done so they can get it          09:38:25

22   to Metro payroll so people can get paid.                      09:38:25

23        And we send out an e-mail every week,                    09:38:27

24   payroll's closing tomorrow -- or TeleStaff's closing         09:38:31

25   tomorrow, make sure time and attendance, make sure           09:38:33
```

```
 1   your time's in, da, da, da, da.  And so in this case,        09:38:35

 2   there were multiple times that the -- that she had           09:38:38

 3   failed to get that time either entered or approved in        09:38:40

 4   a timely basis which then required extra work for my         09:38:44

 5   staff or from payroll to get it paid on their next           09:38:49

 6   paycheck if we didn't -- couldn't get it on that             09:38:52

 7   paycheck.                                                    09:38:56

 8   Q.      When was that?                                       09:38:57

 9   A.      I want to say --                                     09:38:58

10   Q.      Was that when there was -- when it was               09:38:59

11   Chief --                                                     09:39:03

12   A.      I want --                                            09:39:03

13   Q.      -- Hutchison was the chief?                          09:39:04

14   A.      There may have been issues before.  I want to       09:39:06

15   say it started -- I'm not positive about the dates          09:39:10

16   but --                                                       09:39:12

17   Q.      Okay.                                                09:39:12

18   A.      -- I'm not sure if it started beforehand or          09:39:12

19   not.                                                         09:39:15

20   Q.      Okay.  As far as the -- any issues with that,       09:39:15

21   who brought that to your attention?                          09:39:22

22   A.      Jaime Natali who worked in my office at the         09:39:25

23   time.  She was responsible for closing out TeleStaff        09:39:29

24   and making sure that all the information -- 'cause          09:39:32

25   it's not just -- once we get that closed, we've got         09:39:34
```

| | |
|---|---|
| 1 | to go back and make sure that all time worked was | 09:39:38 |
| 2 | compensable for overtime purposes or the change has | 09:39:41 |
| 3 | to be made too.  So if you work 40 hours a week, you | 09:39:44 |
| 4 | work over, you get paid time and a half.  But if you | 09:39:48 |
| 5 | were out sick and you worked over, that's gonna go | 09:39:51 |
| 6 | from time and a half to straight time.  So all those | 09:39:53 |
| 7 | changes have to be made.  And that's the reason we | 09:39:56 |
| 8 | give ourself enough time to get that locked out, to | 09:39:59 |
| 9 | lock down, so that we can make those changes | 09:40:01 |
| 10 | necessary. | 09:40:03 |
| 11 | Q.     Do you know how long Ms. Lawrence has worked | 09:40:04 |
| 12 | for the fire department? | 09:40:06 |
| 13 | A.     I want to say close to 40 years. | 09:40:08 |
| 14 | Q.     Okay.  Do you know -- I'm sorry, let me put | 09:40:11 |
| 15 | this different.  Prior to -- prior to Chief Hutchison | 09:40:16 |
| 16 | becoming the chief, do you know of any disciplinary | 09:40:25 |
| 17 | action that was brought against Ms. Lawrence? | 09:40:31 |
| 18 | A.     I'm not aware of any, no. | 09:40:33 |
| 19 | Q.     Okay. | 09:40:34 |
| 20 | A.     But he gave her a written reprimand.  A | 09:40:39 |
| 21 | reprimand is not disciplinary action.  It's just | 09:40:43 |
| 22 | corrective action. | 09:40:45 |
| 23 | Q.     Okay.  On page 3 of Metro's position | 09:40:46 |
| 24 | statement, at the top of it, states that:  In a | 09:41:09 |
| 25 | follow-up meeting related to the progress of the PIP, | 09:41:13 |

| | | |
|---|---|---|
| 1 | I saw that he had a disciplinary action form in his | 09:41:15 |
| 2 | hand ready to give to me before I could even | 09:41:19 |
| 3 | demonstrate any progress on my PIP. When I came | 09:41:23 |
| 4 | forward with documentation showing I had fully met | 09:41:26 |
| 5 | all the goals set out in the PIP, he did not give me | 09:41:29 |
| 6 | the disciplinary action form. He was clearly | 09:41:32 |
| 7 | predisposed towards disciplinarying (sp) me further | 09:41:37 |
| 8 | without any regard for my progress. Were you in- -- | 09:41:42 |
| 9 | end quote. Were you involved with any of that -- | 09:41:45 |
| 10 | A. Involved -- | 09:41:48 |
| 11 | Q. -- discussion? | 09:41:49 |
| 12 | A. -- in any of what? | 09:41:50 |
| 13 | Q. That discussion between Ms. Lawrence and the | 09:41:51 |
| 14 | chief. | 09:41:54 |
| 15 | A. I was in that meeting. | 09:41:55 |
| 16 | Q. You were? | 09:41:56 |
| 17 | A. Uh-huh. | 09:41:57 |
| 18 | Q. Okay. And when was that meeting, if you | 09:41:57 |
| 19 | recall? | 09:42:00 |
| 20 | A. I don't know. Sometime in the -- I can't | 09:42:02 |
| 21 | remember if it was late 2020 or early 2021. But I | 09:42:05 |
| 22 | want to say the original meeting was -- I don't know. | 09:42:12 |
| 23 | I hate to give a date 'cause I don't want to -- but | 09:42:19 |
| 24 | it was within 60 days of when he originally met with | 09:42:22 |
| 25 | her and set out his performance improvement plan. | 09:42:26 |

| | |
|---|---|
| 1 | Q.      Okay.  The response in part states -- this is | 09:42:27 |
| 2 | about five or six lines down -- a written reprimand, | 09:42:31 |
| 3 | which is a corrective action and not a disciplinary | 09:42:35 |
| 4 | action under the Civil Service rules, had been | 09:42:38 |
| 5 | prepared prior to the meeting since none of the goals | 09:42:40 |
| 6 | of the PIP had been met within the noted timeframe. | 09:42:44 |
| 7 | Is that true? | 09:42:48 |
| 8 | A.      Well, we didn't know.  That was the purpose. | 09:42:49 |
| 9 | So the performance improvement plan laid out specific | 09:42:52 |
| 10 | days and amounts of time, 30 to 45 days of when | 09:42:55 |
| 11 | things needed to be accomplished.  And going into | 09:42:59 |
| 12 | that meeting, we were unaware that they had been | 09:43:02 |
| 13 | accomplished. | 09:43:06 |
| 14 |         So, yes, that was true, it was created.  And | 09:43:06 |
| 15 | we showed up at the meeting and she had some of the | 09:43:10 |
| 16 | stuff done.  And that's what Chief Hutchison stated | 09:43:13 |
| 17 | to her in that meeting is if you had all this done | 09:43:16 |
| 18 | already, why didn't you give it to me.  And she said, | 09:43:19 |
| 19 | well, 'cause you didn't ask for it, even though he | 09:43:21 |
| 20 | stated in the plan within the timeframe.  So we were | 09:43:24 |
| 21 | having to go to -- again, I think he was -- felt like | 09:43:27 |
| 22 | he was having to go to her and say give me what | 09:43:30 |
| 23 | you've got instead of just turning it over as they | 09:43:33 |
| 24 | were completed. | 09:43:36 |
| 25 | Q.      But what it -- what it states, actually, is | 09:43:37 |

| | |
|---|---|
| 1 | that a written reprimand had been prepared since none | 09:43:39 |
| 2 | of the goals in the PIP had been met within the noted | 09:43:44 |
| 3 | timeframe.  It states that, correct? | 09:43:47 |
| 4 | A.      Correct. | 09:43:50 |
| 5 | Q.      But what you're saying -- and please correct | 09:43:51 |
| 6 | me if I'm wrong -- is what it really should have | 09:43:54 |
| 7 | stated was a written reprimand had been prepared | 09:43:57 |
| 8 | prior to the meeting since we believed that none of | 09:44:01 |
| 9 | the goals in the PIP had been met within the noted | 09:44:05 |
| 10 | timeframe? | 09:44:09 |
| 11 | A.      Well, we state in the very next sentence that | 09:44:09 |
| 12 | Ms. Lawrence brought the documentation with her to | 09:44:12 |
| 13 | the meeting that showed she was working or -- well, | 09:44:14 |
| 14 | that should say working -- on some of the items | 09:44:17 |
| 15 | identified in the PIP.  So this -- to me, what this | 09:44:21 |
| 16 | is saying is it's explaining what happened in that | 09:44:25 |
| 17 | meeting.  I'm not saying that we believed it hadn't | 09:44:29 |
| 18 | been done.  At the time, we had no idea it hadn't | 09:44:31 |
| 19 | been so we didn't know.  And then we -- she brought | 09:44:34 |
| 20 | them to the meeting which is stated in the next | 09:44:36 |
| 21 | sentence. | 09:44:39 |
| 22 | Q.      So they had been completed? | 09:44:39 |
| 23 | A.      Some of them according to the way this is | 09:44:41 |
| 24 | written.  But then it also says that the goals -- | 09:44:44 |
| 25 | however -- where am I?  I've lost it.  During the | 09:44:45 |

09:44:47
09:44:49
09:44:51
09:44:54
09:44:59
09:45:01
09:45:03
09:45:07

```
 1   meeting they dis- -- showed prog- -- that some
 2   progress had been made.  And I don't know the
 3   specifics about which -- what was there and what
 4   wasn't, but we had a very lengthy meeting, close to
 5   probably an hour.  And she had a whole bunch of
 6   documents.  And I think that even Chief Hutchison
 7   noted that some of the stuff was done but that more
 8   needed attention.
 9   Q.      Okay.  You mentioned Chief Hutchison.  Now,
10   Chief Hutchison became the chief when, do you know?
11   A.      I don't.
12   Q.      Do you know -- well, when did you first learn
13   about Chief Hutchison --
14   A.      Well --
15   Q.      -- like as a -- as a --
16   A.      As a person?
17   Q.      -- an employee?  As an employee.
18   A.      Gosh, I don't know.  Eight, ten years ago
19   when I came here.
20   Q.      Okay.  What was his job at that time?
21   A.      I don't know what he was when I -- was when I
22   first came here but I do -- he may have still been in
23   the field.  At some point, he left operations --
24   field operations and went to the training academy to
25   be this -- an instructor.
```

```
 1   Q.      Explain what that is.                          09:45:46

 2   A.      So they're the people who train and get all    09:45:48

 3   of our employees, our new fire recruits, passed on     09:45:51

 4   their tests to get their EMT license and get them out  09:45:56

 5   in the field.  He's a trainer.                         09:45:59

 6   Q.      And did he -- when he came to the fire         09:46:03

 7   marshal's office, do you know of his past experience?  09:46:10

 8   You said he was a trainer for field recruits,          09:46:14

 9   correct?                                               09:46:17

10   A.      Correct.                                       09:46:17

11   Q.      Do you know what else he did?                  09:46:17

12   A.      He owned a construction business on the side,  09:46:19

13   but I don't -- I mean, we weren't -- I didn't know     09:46:21

14   him personally.                                        09:46:25

15   Q.      Do you know the name of that construction      09:46:30

16   business?                                              09:46:33

17   A.      I don't.                                       09:46:33

18   Q.      Okay.  What else did he do with regards to     09:46:33

19   the fire department?                                   09:46:39

20   A.      Meaning like his history?                      09:46:43

21   Q.      Yes, ma'am.                                    09:46:45

22   A.      Oh, I -- he -- I know that he was a            09:46:45

23   firefighter.  I do not know if he was an engineer.  I  09:46:48

24   know, at one point, he was a captain and then an       09:46:52

25   instructor.                                            09:46:55
```

| | | |
|---|---|---|
| 1 | Q.      Okay.  And how high up along the rung of the | 09:46:55 |
| 2 | fire department is that? | 09:47:00 |
| 3 | A.      So it's your first level of supervision in | 09:47:01 |
| 4 | the fire -- like in the field operations, which would | 09:47:07 |
| 5 | be the equivalent of the assistant fire marshal. | 09:47:12 |
| 6 | Like those are the same grade kind of rank, your | 09:47:13 |
| 7 | first level of supervision; that's what his -- where | 09:47:15 |
| 8 | he was when he was -- left the field and went to the | 09:47:18 |
| 9 | academy. | 09:47:22 |
| 10 | Q.      Okay.  And then how many levels of | 09:47:22 |
| 11 | supervision are there before you get to the fire | 09:47:24 |
| 12 | marshal? | 09:47:26 |
| 13 | A.      One. | 09:47:26 |
| 14 | Q.      Okay.  So there's -- | 09:47:27 |
| 15 | A.      Well, two if you count the assistant fire | 09:47:28 |
| 16 | marshal so -- | 09:47:32 |
| 17 | Q.      Okay.  So he was a level one kind of -- based | 09:47:32 |
| 18 | on what you're saying when he came here? | 09:47:35 |
| 19 | A.      I call it a first-line supervisor. | 09:47:39 |
| 20 | Q.      First-line supervisor? | 09:47:40 |
| 21 | A.      I don't know if that's what -- if he was | 09:47:42 |
| 22 | already a district chief when he came to the fire | 09:47:45 |
| 23 | marshal's office or not.  I don't -- I don't know -- | 09:47:49 |
| 24 | I don't have that timeframe.  I'd have to look at it. | 09:47:51 |
| 25 | Q.      And when he was a first-line supervisor, | 09:47:54 |

1 what -- was Maggie a second-line supervisor?

2 A.      I don't know what year.  I want to say -- I

3 don't know what year she became a deputy fire

4 marshal, so I don't know what year that was.

5 Q.      Is a deputy fire marshal a second-line

6 supervisor?

7 A.      Yes.

8 Q.      Okay.  So if Mr. Hutchison came over here as

9 a first-line supervisor, when -- if -- if Maggie was

10 an assistant fire marshal, she would have been a

11 second-line supervisor; is that correct?

12 A.      Yeah.  She would have been a level above

13 him --

14 Q.      A level above.

15 A.      -- if he was still captain when he came over.

16 Q.      Okay.  Do you know how he became aware or do

17 you know how the fire marshal's office made him aware

18 of the opening that he ultimately received, the --

19 becoming the fire marshal?

20 A.      Well, there wasn't an opening at the time.

21 There was -- Al Thomas was the fire marshal --

22 Q.      Okay.

23 A.      -- still.  And I don't know how that whole

24 thing came about.  I just know that it happened.

25 Q.      Okay.  Was there a posting?

```
 1   A.      No.  You don't -- the chief can assign anyone        09:49:05
 2   in this department to work anywhere that he deems            09:49:09
 3   necessary.  And so by assignment, he was an                  09:49:13
 4   instructor.  And Chief brought him out of the fire           09:49:16
 5   marshal -- I mean out of the training academy and            09:49:18
 6   assigned him to the fire marshal's office at the time        09:49:21
 7   to shadow Al Thomas to learn more about the office           09:49:24
 8   downstairs and the day-to-day operations of it.             09:49:29
 9   Q.      Do you have any understanding as to why that        09:49:32
10   took place?                                                  09:49:35
11   A.      I have -- what I was told, which is that            09:49:37
12   Chief Swann wanted to work on that division.  It was         09:49:41
13   our only division at the time that was just -- we had        09:49:47
14   no succession planning going forward; that Al Thomas         09:49:50
15   hasn't done anything or prepared anyone to take on           09:49:55
16   that division in our long-term goals, three to five          09:49:57
17   years, five to ten years what's gonna happen next.          09:50:00
18   We'd just done that at logistics.  We had a plan in          09:50:05
19   place in EMS.  And so as a department, he was trying         09:50:09
20   to move us forward so that we had a plan when Al left        09:50:12
21   of what was gonna happened next.  And that was what          09:50:17
22   the purpose of it was for.                                   09:50:20
23   Q.      Do you find it odd that someone outside of          09:50:23
24   the fire marshal's office was brought in to                  09:50:30
25   ultimately become the fire marshal?                          09:50:38
```

| | | |
|---|---|---|
| 1 | A.     Not at all.  It's happened the past three | 09:50:40 |
| 2 | fire marshals we've had. | 09:50:42 |
| 3 | Q.     Okay.  So all three fire marshals prior were | 09:50:43 |
| 4 | brought in from other -- | 09:50:47 |
| 5 | A.     Correct. | 09:50:48 |
| 6 | Q.     -- departments and brought over to run the | 09:50:48 |
| 7 | fire marshal's office? | 09:50:52 |
| 8 | A.     They were -- so Al Thomas had left here.  We | 09:50:53 |
| 9 | rehired him back to be the fire marshal.  Before | 09:50:56 |
| 10 | that, it was Chief Henderson who's the deputy chief | 09:50:59 |
| 11 | over operations.  Before that, it was Steve Holt who | 09:51:02 |
| 12 | was also a deputy chief over operations.  And before | 09:51:05 |
| 13 | that, it was Dave Birdwell who was the chief training | 09:51:08 |
| 14 | officer at the fire academy.  Those were all what | 09:51:12 |
| 15 | happened after Danny Hunt retired who was the first | 09:51:15 |
| 16 | fire -- well, who was the fire marshal when I came | 09:51:18 |
| 17 | here and had been the fire marshal forever, like | 09:51:19 |
| 18 | 20-something years maybe; a long time. | 09:51:23 |
| 19 | Q.     Do you know the Civil Service rules as far as | 09:51:25 |
| 20 | what is supposed to be posted jobwise and what is not | 09:51:27 |
| 21 | supposed to be posted? | 09:51:31 |
| 22 | A.     I do. | 09:51:32 |
| 23 | Q.     And can you tell me how that's decided. | 09:51:33 |
| 24 | A.     Yeah.  So the law requires that we have a | 09:51:36 |
| 25 | fire marshal and the State law requires that the fire | 09:51:38 |

```
 1    marshal is to be appointed and named by Chief Swann          09:51:42
 2    with -- I think the mayor has to approve it, sign off        09:51:46
 3    on it.  But the Civil Service only requires that we          09:51:51
 4    have a named fire marshal.  It doesn't require that          09:51:54
 5    we have a promotional process to name someone into          09:51:58
 6    that classification.                                          09:52:01
 7    Q.      So are you saying that no posting is                  09:52:13
 8    necessary for a fire marshal's position?                     09:52:16
 9    A.      Correct.                                              09:52:20
10    Q.      Okay.  Was --                                         09:52:21
11    A.      And let me restate that.  The fire marshal           09:52:22
12    position is a position.  It's somebody who serves in         09:52:27
13    that role, but we do not have to post the                    09:52:32
14    classification.  Anyone of any title, if they meet           09:52:35
15    the State requirements, can be the fire marshal if           09:52:39
16    Chief Swann appoints them as such.  Does that make           09:52:42
17    sense?                                                        09:52:45
18    Q.      So what I'm hearing you say --                        09:52:47
19            And I'm just trying to -- I just --                   09:52:51
20    A.      Sure.                                                 09:52:52
21    Q.      -- want to get to the truth, right?                   09:52:52
22    A.      Sure.                                                 09:52:56
23    Q.      -- is that there are no set qualifications to         09:52:56
24    become the fire marshal; anyone can become the fire          09:53:00
25    marshal?                                                      09:53:02
```

| | | |
|---|---|---|
| 1 | A. There are State requirements. The Tennessee | 09:53:02 |
| 2 | Code Annotated lays out the requirements. And I | 09:53:05 |
| 3 | don't have those in front of me, but they're very | 09:53:08 |
| 4 | specific of what has to happen. And it gives the | 09:53:10 |
| 5 | discretion of the chief to make that recommendation | 09:53:14 |
| 6 | that then has to be signed off by the State fire | 09:53:16 |
| 7 | marshal. | 09:53:20 |
| 8 | Q. So as long as you meet the State | 09:53:20 |
| 9 | requirements, you can -- one can become a fire | 09:53:23 |
| 10 | marshal, correct? | 09:53:26 |
| 11 | A. Correct. | 09:53:26 |
| 12 | Q. But what I'm trying to get at is whether that | 09:53:26 |
| 13 | job opening needs to be posted; that there -- does it | 09:53:31 |
| 14 | need to be posted under -- | 09:53:37 |
| 15 | A. I don't think so. | 09:53:39 |
| 16 | Q. Okay. So if -- do you know under the Civil | 09:53:39 |
| 17 | Service rules if it needs to be posted? | 09:53:47 |
| 18 | A. I don't think anywhere it states that a | 09:53:50 |
| 19 | position has to be posted as a promotional for | 09:53:53 |
| 20 | someone to take that job. So if we have -- now, if | 09:53:57 |
| 21 | we were gonna go -- in this case, use Al Thomas. We | 09:54:00 |
| 22 | had to post a position -- which it was not called the | 09:54:03 |
| 23 | fire marshal. It was called the executive | 09:54:06 |
| 24 | administrator of fire. We hired him off that list. | 09:54:09 |
| 25 | So there are requirements that you have to be on a | 09:54:12 |

```
 1    register for certain type of jobs.                          09:54:15

 2         So when Maggie made deputy fire marshal,               09:54:17

 3    that's a promotional process.  People compete for           09:54:19

 4    that job.  But the chart -- but even if we made her         09:54:22

 5    the deputy fire marshal, Chief could assign her             09:54:26

 6    anywhere in this department he wanted to even if            09:54:30

 7    that's the title that she holds per the charter.  He        09:54:33

 8    makes the assignments of all of his employees.              09:54:36

 9         So, for example, Commander Ramsey who's at             09:54:39

10    logistics was a fire district chief in operations and       09:54:41

11    was pulled out of that and assigned to the logistics        09:54:45

12    division to run logistics.  Brian Butler, the same          09:54:48

13    way, he was a district chief working in                     09:54:53

14    administration for headquarters; pulled out of              09:54:56

15    headquarters and moved out to become the district          09:55:00

16    underneath, the level-two supervisor, to Commander         09:55:01

17    Ramsey at logistics.                                        09:55:03

18         Chief Jordan who's at the academy is the same          09:55:06

19    way, field operations.  So Chief Tony, how he came up      09:55:09

20    here, he came out of safety.  He went out of the            09:55:13

21    field into safety and then up to administration.  So        09:55:14

22    there's different career paths but you don't -- we          09:55:17

23    don't -- every time we have an opening in a division,       09:55:20

24    we don't necessarily post that job.                         09:55:23

25    Q.    You just mentioned a whole number of                  09:55:23
```

1   different people, correct --

2   A.      Yeah.

3   Q.      -- in the last 30 seconds?  For all of those

4   different positions, were there ever postings or did

5   people in the fire department just decide who they

6   wanted for the job and pick them?

7   A.      They were not posted, no.

8   Q.      So all of those positions, some -- the chief

9   just has discretion to say I want you from wherever,

10  come here, I want you, so on and so forth?

11  A.      Correct.

12  Q.      Okay.  And had you -- has that always been

13  true?

14  A.      Since I've been here.

15  Q.      Okay.  So, basically, as long -- it's kind of

16  like -- it's my understanding, at least, that within

17  certain sections of Metro, the individual who's at

18  the top can just pick whoever they want to be in

19  their division; is that true?

20  A.      If they already work for that department and

21  they are willing to take that position for the money

22  that they're making at the time, sure.  So --

23  Q.      What about people who are outside of Metro,

24  how are they supposed to learn of an opening?  Is it

25  just --

```
 1   A.      No, those, we would have to post.  So there's      09:56:37
 2   different kinds of postings.  There are department        09:56:41
 3   only, Metro-wide, and what they call open                 09:56:43
 4   competitive.  That's for anyone who doesn't work          09:56:47
 5   outside of Metro.  It also -- I mean, people who          09:56:51
 6   works outside of Metro.  It's also for people who may     09:56:51
 7   be in a non Civil Service at the health department        09:56:56
 8   and they want to come work for us.  They have to post     09:56:57
 9   because we are a Civil Service department.  So you        09:57:00
10   get hired in entry level, the bottom, in a number of     09:57:01
11   different ways through Civil Service postings.  And      09:57:05
12   then you can move up through postings -- I mean,          09:57:08
13   through position openings for promotions but can be       09:57:12
14   assigned anywhere.                                        09:57:15
15   Q.      I guess what I'm trying to say is what if I       09:57:16
16   was a fire marshal in Cheatham County and I wanted to     09:57:20
17   move to Nashville to become the fire marshal, how        09:57:24
18   would -- how would I know that there's an open            09:57:27
19   position, or I just wouldn't?                             09:57:29
20   A.      You wouldn't unless we posted that.               09:57:30
21   Q.      Who decides what's posted and what's not?         09:57:34
22   A.      Chief Swann will -- we will have meetings --      09:57:38
23   I mean, it's ultimately his decision, but we have         09:57:40
24   meetings to discuss things like that.  For example,       09:57:43
25   Chief White is the one who brought back Al Thomas who     09:57:47
```

```
 1    had left here -- had retired and left, and Chief          09:57:50
 2    White was the one who wanted to bring him back and         09:57:54
 3    run the administrative division.  So he was hired to       09:57:58
 4    be over all the buildings, new buildings, things like      09:58:00
 5    that that we were building and then was assigned to        09:58:05
 6    be the fire marshal as well.                               09:58:07
 7    Q.     Are there interviews with regards to being a        09:58:08
 8    fire marshal when you decide that you want to apply        09:58:11
 9    for a position?                                            09:58:15
10    A.     If it was posted; meaning if we had a              09:58:17
11    promotional process, then, yes, that would require an     09:58:21
12    interview.  But we don't have to do -- we don't have      09:58:25
13    to do interviews for people who already work here.        09:58:29
14    Q.     And I'm not trying to belabor the point.  I'm      09:58:45
15    just trying to wrap my head around -- you just stated     09:58:49
16    if there is a promotional process, then there are         09:58:53
17    interviews, but if there's not a promotional process,     09:58:56
18    then there does not have to be an interview; is that      09:59:00
19    correct?                                                   09:59:03
20    A.     No.  Promotional -- a promotional process is       09:59:03
21    laid out in Civil Service about what has to happen.       09:59:07
22    And it doesn't have to necessarily be an interview.       09:59:09
23    It could be a written test.  It can be a mixture of       09:59:11
24    written and an interview.  But for some of them, we       09:59:14
25    may do a practical test.  It just depends on what the     09:59:19
```

| | |
|---|---|
| 1 | job is.  And if it's posted by Civil Service rules, | 09:59:23 |
| 2 | then we would follow those rules.  But not every job | 09:59:26 |
| 3 | requires -- movement within inside the department | 09:59:31 |
| 4 | requires it to be posted. | 09:59:35 |
| 5 | Q.      You had stated earlier that Chief Hutchison | 09:59:38 |
| 6 | owned a construction business on the side? | 09:59:46 |
| 7 | A.      That's my understanding, yes. | 09:59:48 |
| 8 | Q.      Do you know the name of that construction | 09:59:49 |
| 9 | business? | 09:59:51 |
| 10 | A.      I do not. | 09:59:51 |
| 11 | Q.      So do you know how much time or effort he | 09:59:52 |
| 12 | took for that construction business? | 09:59:57 |
| 13 | A.      I do not. | 09:59:59 |
| 14 | Q.      Okay.  So as long as he met the basic | 09:59:59 |
| 15 | qualifications as -- to become a -- become a fire | 10:00:06 |
| 16 | marshal, no one would even have to look into how much | 10:00:12 |
| 17 | time he spent for that construction business; is that | 10:00:16 |
| 18 | correct? | 10:00:20 |
| 19 | A.      I don't understand the question. | 10:00:20 |
| 20 | Q.      Okay.  Let me put it this way, if I met the | 10:00:21 |
| 21 | basic qualifications to become the fire marshal -- | 10:00:25 |
| 22 |         Okay? | 10:00:28 |
| 23 | A.      Okay. | 10:00:28 |
| 24 | Q.      -- currently, but I also ran a construction | 10:00:29 |
| 25 | business at the same time -- | 10:00:33 |

```
 1          Okay?                                                10:00:34

 2          Let's pretend that I spent eight hours a day         10:00:36

 3    running my construction business.  The chief could        10:00:41

 4    still say, hey, Bigelow, I like you the best and I'm       10:00:46

 5    gonna make you the fire marshal; is that correct?         10:00:51

 6    A.      Well, I don't know what one thing has to do        10:00:55

 7    with the other.  I think that's where I'm -- I don't       10:00:57

 8    know what the construction business -- I don't know       10:01:00

 9    if that business is accurate, if he -- I mean, if          10:01:01

10    it's still open, if he stopped doing that when he --       10:01:03

11    most employees in the fire department who work on          10:01:07

12    shift, fire, EMS, 24, 48, they own businesses on the       10:01:09

13    side because they're not working five days a week.         10:01:13

14    So for all I know, Mr. Hutchison let his construction      10:01:16

15    business go when he went to the training academy;          10:01:21

16    he's working five days a week.  I don't know that.        10:01:24

17    Q.      Okay.                                              10:01:26

18    A.      I -- I guess I'm trying -- I don't understand      10:01:27

19    your question about working as -- in construction and      10:01:29

20    being the fire marshal.                                    10:01:31

21    Q.      Okay.  Let me -- let me phrase it                   10:01:32

22    differently.  Let's pretend that I wanted to be the       10:01:35

23    fire marshal and I met -- you had said earlier             10:01:39

24    there's basic qualifications you need to meet to           10:01:43

25    become the fire marshal.  Right?                           10:01:47
```

```
 1   A.      Right.                                            10:01:47

 2   Q.      Assume for this sake I meet all of those          10:01:48

 3   qualifications today.                                     10:01:52

 4           Okay?                                             10:01:53

 5   A.      Okay.                                             10:01:54

 6   Q.      But I also have a construction business and I     10:01:54

 7   spend 75 hours a week working on my construction          10:02:03

 8   business.  Assume those things as fact.  Okay?            10:02:08

 9   A.      Okay.                                             10:02:11

10   Q.      Chief Swann today could say if he wanted,         10:02:11

11   based on what you're telling me, hey, Robb Bigelow, I     10:02:17

12   want you to be the new fire marshal --                    10:02:21

13           MR. PUCKETT:  Object to the form.                 10:02:22

14   BY MR. BIGELOW:                                           10:02:22

15   Q.      -- is that correct?                               10:02:24

16   A.      Well, you would have -- do you currently work     10:02:24

17   for the fire department?                                  10:02:26

18   Q.      I currently work for the fire department,         10:02:27

19   correct.                                                  10:02:29

20   A.      I would struggle to see how you would have 75     10:02:29

21   hours a week to --                                        10:02:32

22   Q.      Okay.  Let's say -- let's say 25 -- let's say     10:02:33

23   25 hours a week.                                          10:02:35

24   A.      Okay.                                             10:02:36

25           MR. PUCKETT:  Object to the form.                 10:02:36
```

```
 1            THE WITNESS:  Sorry.  And so -- and you          10:02:37
 2   currently work for the fire department --              10:02:38
 3   BY MR. BIGELOW:                                        10:02:38
 4   Q.      Yep.                                           10:02:40
 5   A.      -- as a what, just anything, firefighter?     10:02:40
 6   Q.      As a -- the same thing that Chief             10:02:44
 7   Hutchison --                                           10:02:44
 8   A.      Gotcha.                                        10:02:49
 9   Q.      -- used to work for.                           10:02:49
10   A.      Then, yes --                                   10:02:51
11   Q.      Okay.                                          10:02:52
12   A.      -- the chief could do that.                    10:02:52
13   Q.      Okay.  How long have you known Maggie?         10:02:55
14   A.      Well, I think we knew each other before I      10:03:14
15   came to work here, so it's been a while.  I was        10:03:17
16   the -- I started in Metro in 1998 and I was the field  10:03:20
17   rep for the fire department.  So I've been working     10:03:24
18   with the fire department for a long but I'd say 20     10:03:27
19   years probably.                                        10:03:29
20   Q.      Did you have a good relationship with her?     10:03:30
21   A.      I think so.                                     10:03:32
22   Q.      Okay.  If she had been given the position of   10:03:34
23   fire marshal, would it have surprised you?             10:03:41
24   A.      I don't know how to answer that.  I mean,      10:03:48
25   what do you mean by surprised, like if Chief had       10:03:50
```

```
 1    named her the fire marshal?                           10:03:52

 2    Q.      Yeah.  Yeah.                                   10:03:54

 3    A.      Yes, I would have probably been surprised.     10:03:56

 4    Q.      Why?                                           10:03:58

 5    A.      Because I know that Maggie does a really good  10:03:59

 6    job doing her job, but I don't see anything -- I've    10:04:04

 7    seen the downward slope of the fire marshal's office   10:04:07

 8    over a period of years.  And I thought at the time     10:04:12

 9    when Al came back in that that was gonna turn the      10:04:17

10    department around or turn that division around and     10:04:21

11    traject it kind of forward and it didn't.              10:04:24

12            So I think I noted in some of my responses --  10:04:27

13    and no disrespect whatsoever, but there's just the     10:04:34

14    lack of the ability to manage.  As I noted in the --   10:04:38

15    I think my EEOC report; not this one in the            10:04:42

16    complaint, the fire marshal's office, they had the     10:04:47

17    front desk in 2016.  They were responsible for the     10:04:50

18    front desk.  And there was a not-so-great employee     10:04:53

19    down there and she had issues.  They didn't know how   10:04:57

20    to manage the front desk, the people, the time, the    10:05:01

21    answering the phones so I had to take it back over     10:05:04

22    and then run it until Al Thomas got here.              10:05:07

23            And even then, I had to have a lot of input    10:05:10

24    with the front desk because it couldn't be managed     10:05:13

25    downstairs.  Now, I don't know what the setup was or   10:05:17
```

| | | |
|---|---|---|
| 1 | who was responsible for it, but there were issues | 10:05:21 |
| 2 | like that after -- the same with TeleStaff after | 10:05:24 |
| 3 | multiple times going through this trying to, you | 10:05:26 |
| 4 | know, work through the -- the TeleStaff issue wasn't | 10:05:33 |
| 5 | done.  And I just didn't see a lot of initiative | 10:05:38 |
| 6 | there to be honest. | 10:05:41 |
| 7 | Q.    You just mentioned a second ago you don't | 10:05:46 |
| 8 | know who was responsible for that, correct? | 10:05:49 |
| 9 | A.    Who was responsible at -- who was -- | 10:05:52 |
| 10 | Q.    For the -- | 10:05:52 |
| 11 | A.    -- supposed to oversee the front desk. | 10:05:54 |
| 12 | Q.    So if you don't know who was responsible to | 10:05:56 |
| 13 | oversee the front desk, why would you say that that | 10:06:00 |
| 14 | was Maggie's fault if things were going wrong? | 10:06:03 |
| 15 | A.    Because she was the highest ranking fire | 10:06:06 |
| 16 | marshal or dep- -- she was the highest ranking | 10:06:10 |
| 17 | supervisor down there at that time.  So even if it | 10:06:12 |
| 18 | wasn't directly her, if it was one of her | 10:06:15 |
| 19 | subordinates, she would still be responsible for it | 10:06:18 |
| 20 | as the deputy fire marshal in the fire marshal's | 10:06:21 |
| 21 | office. | 10:06:24 |
| 22 | Q.    Do you know if she ever got written up for | 10:06:24 |
| 23 | that or reprimanded? | 10:06:28 |
| 24 | A.    No.  I was instructed at the time by the Fire | 10:06:29 |
| 25 | Marshal Holt to just do him a favor and take that | 10:06:31 |

```
 1   over because he was tired of listening to it.        10:06:34
 2   Q.      This was under Fire Marshal Holt you're      10:06:40
 3   saying?                                               10:06:43
 4   A.      Yes, Steve Holt.                              10:06:44
 5   Q.      Okay.  And what year was that?                10:06:44
 6   A.      2016, 2017.                                   10:06:46
 7   Q.      What -- and who was the next fire marshal?    10:06:49
 8   A.      Then it was Al Thomas.                        10:06:53
 9   Q.      Was it your understanding that Fire Marshal   10:06:57
10   Thomas was planning on Maggie to succeed him?        10:07:01
11   A.      It was not my understanding.                  10:07:06
12   Q.      Okay.  What was your understanding?           10:07:07
13   A.      I don't know that he had a plan.  And I think 10:07:10
14   that's what started -- in fact, it's my understanding 10:07:13
15   from Chief Swann and the conversations that I've been 10:07:17
16   involved in that they brought in Al to -- because his 10:07:20
17   argument for everything that wasn't being done or was 10:07:26
18   being done wrong was I don't have any help, I don't   10:07:30
19   have anyone who can do it so I'm doing it all myself. 10:07:34
20          And so that's kind of what kicked this off.    10:07:37
21   And it wasn't until Chief Hutchison's name was        10:07:39
22   brought into the picture that all of the sudden Al    10:07:43
23   wanted Maggie to be the next fire marshal.            10:07:46
24   Q.      Okay.  I'm missing something.  I had just     10:07:57
25   asked you if it was your understanding if Al wanted   10:08:00
```

```
 1   Maggie to be the next fire marshal.  And my                10:08:04
 2   understanding was you said, no, that's not true.  But      10:08:07
 3   at that -- the very end of what you just said, you         10:08:09
 4   said that's when Al wanted Maggie to be the next fire      10:08:14
 5   marshal.                                                   10:08:18
 6   A.      I can restate.  I'll restate --                    10:08:18
 7   Q.      But that's -- but that's what you said,            10:08:21
 8   though, correct?                                           10:08:23
 9   A.      My -- if I didn't preface it, I went -- I          10:08:23
10   should have said in the beginning, that was not my        10:08:26
11   understanding.  But it became my understanding after      10:08:30
12   Al saw the writing on the wall that he wasn't able to     10:08:32
13   keep his division -- you know, to prepare the             10:08:36
14   division and move it forward.  And then that's when I     10:08:39
15   guess he stated that he wanted Maggie to be the fire      10:08:43
16   marshal.  At least that's what I've been told.            10:08:47
17   Q.      So the answer was, yes, at some point, it's       10:08:50
18   your understanding that Al wanted Maggie to be the        10:08:53
19   next fire marshal?                                        10:08:55
20   A.      At some point, yes.                               10:08:56
21   Q.      Okay.  Do you know how old Chief Hutchison        10:08:57
22   is?                                                       10:09:04
23   A.      48.  47, 48.                                      10:09:05
24   Q.      Okay.                                             10:09:06
25   A.      Something -- I think he just had a birthday.      10:09:08
```

```
 1    I'm not positive.                                      10:09:10

 2    Q.      Even though opposing counsel already has it,   10:09:20

 3    I know I'm gonna hand him a little packet, complaint   10:09:23

 4    and the answer.  I'm gonna hand you the same thing,    10:09:27

 5    ma'am.                                                 10:09:30

 6    A.      Do I hold onto this position statement?        10:09:31

 7    Q.      Is it al- -- do you already --                 10:09:36

 8    A.      She's already Bates stamped it.                10:09:37

 9    Q.      Then I think you're fine.  We'll know --       10:09:39

10    A.      I mean, not -- whatever that's called, maybe   10:09:41

11    stamped it.  Okay.                                     10:09:44

12    Q.      Do you recognize what I just handed you?       10:09:55

13    A.      I do.                                          10:09:56

14    Q.      Okay.  And the first document is the           10:09:57

15    complaint, correct?                                    10:10:00

16    A.      Yes.                                           10:10:01

17    Q.      And the second is Metro's answer to the        10:10:02

18    complaint, correct?                                    10:10:07

19    A.      Yes.                                           10:10:07

20    Q.      Okay.                                          10:10:07

21            MR. BIGELOW:  Could I have those marked        10:10:09

22    separately, please?                                    10:10:09

23            THE REPORTER:  Which one would you like        10:10:12

24    first?                                                 10:10:13

25            MR. BIGELOW:  The complaint be the first,      10:10:14
```

| | |
|---|---|
| 1 | which I guess would be, what, Exhibit Number 4, and |
| 2 | then the answer being Exhibit Number 5.  Thank you. |
| 3 | (WHEREUPON, the above-mentioned documents |
| 4 | were respectively marked as Exhibit Number 4 and |
| 5 | Exhibit Number 5.) |
| 6 | BY MR. BIGELOW: |
| 7 | Q.      I'm gonna do my best to get you out of here |
| 8 | by lunch, but we're gonna take a little bit of time |
| 9 | and read over the complaint and the answer.  Okay? |
| 10 | A.      Okay. |
| 11 | Q.      I'm gonna start with the complaint.  It |
| 12 | starts:  Maggie Lawrence is a 64-year-old African |
| 13 | American woman who has been a dedicated employee of |
| 14 | the Nashville Fire Department for over 30 years. |
| 15 | Well, would you agree with that statement? |
| 16 | A.      Yes. |
| 17 | Q.      Okay.  In recognition of her outstanding |
| 18 | efforts and consistent performance, her former boss, |
| 19 | Al Thomas, was grooming her to succeed him as fire |
| 20 | marshal.  Would you also agree with that based on |
| 21 | what you just said a minute ago? |
| 22 | A.      After he knew that he was -- after he knew |
| 23 | that he was -- that we were gonna bring Chief |
| 24 | Hutchison over, yes. |
| 25 | Q.      Okay.  So it's your understanding that he |

Timestamps:
10:10:21
10:10:24
10:10:38
10:10:38
10:10:39
10:10:40
10:10:41
10:10:44
10:10:46
10:10:48
10:10:52
10:10:57
10:11:00
10:11:03
10:11:06
10:11:08
10:11:08
10:11:11
10:11:16
10:11:19
10:11:21
10:11:24
10:11:26
10:11:28
10:11:30

only wanted Maggie to become fire marshal after he          10:11:33
2   knew that someone else -- that someone else had been        10:11:36
3   handpicked?                                                 10:11:39
4   A.      I think he saw the writing on the wall.  He         10:11:40
5   saw the issues that he had going on down there that         10:11:43
6   he wasn't able to fix, and that when Chief mentioned        10:11:47
7   bringing Hutchison over there -- down there to shadow       10:11:52
8   him, that's when he decided that he wanted Maggie to        10:11:55
9   succeed him.  I don't think before that he ever            10:12:00
10  mentioned it to anyone that I'm aware of.                   10:12:03
11  Q.      Okay.  As Ms. Lawrence -- I'm reading more --       10:12:05
12  as Ms. Lawrence was preparing to become Nashville           10:12:12
13  Fire Department's first female fire marshal, the            10:12:18
14  department's chief took drastic measures to ensure          10:12:18
15  that the good ol' boys' club stayed in place.  My           10:12:22
16  guess is you're gonna disagree with that.                   10:12:26
17  A.      I am.                                                10:12:28
18  Q.      But you would agree, I believe, that there's        10:12:29
19  never been a female fire marshal in Davidson County;        10:12:31
20  is that correct?                                            10:12:34
21  A.      Not that I'm aware of, not for the Nashville        10:12:35
22  Fire Department.                                            10:12:37
23  Q.      That's what I'm saying.                             10:12:37
24  A.      No.                                                  10:12:42
25  Q.      Okay.  He reassigned a significantly younger,       10:12:42

```
1    less experienced male employee from another              10:12:46
2    department to the fire marshal's office and               10:12:49
3    instructed Ms. Lawrence and her boss to train him to      10:12:52
4    take over.                                                10:12:57
5              MR. PUCKETT:  Object to the form.               10:12:58
6    BY MR. BIGELOW:                                           10:12:59
7    Q.    That's what -- that's what I just read.  And        10:13:00
8    I'm just gonna ask you --                                 10:13:02
9              MR. BIGELOW:  I -- did I misread that?          10:13:04
10             MR. PUCKETT:  No, no.  I'm sorry.  Go           10:13:05
11   ahead.  Finish your question.                             10:13:07
12             MR. BIGELOW:  Did I misread that?  I            10:13:09
13   don't think I did but --                                  10:13:11
14             MR. PUCKETT:  No, you did not.                  10:13:11
15   BY MR. BIGELOW:                                           10:13:13
16   Q.    Okay.  Would you agree with that?                   10:13:13
17             MR. PUCKETT:  Object to the form.               10:13:14
18             THE WITNESS:  I don't know if I would           10:13:21
19   agree with less experienced or what defines               10:13:23
20   significantly younger.  But Mr. Hutchison is younger      10:13:27
21   and, no, he hadn't worked in the fire marshal's           10:13:29
22   office before, but I don't know if that means he's        10:13:33
23   less experienced.  Our firefighters have plenty of        10:13:36
24   experience with preplans and looking at departments.      10:13:40
25   And a lot of them for a long time even held fire          10:13:42
```

```
 1   inspector certifications.  So I don't know -- I --          10:13:47
 2   that I would agree with a less experienced man, male        10:13:49
 3   employee.                                                    10:13:54
 4            And I think, initially, he instructed Mr.          10:13:54
 5   Thomas to train him.  And it wasn't until Thomas was        10:13:58
 6   terminated that then he started working with Maggie.        10:14:01
 7   At least that's my understanding.                           10:14:05
 8   BY MR. BIGELOW:                                             10:14:05
 9   Q.     Okay.  I'm gonna break this down a little bit        10:14:07
10   more.                                                       10:14:10
11   A.     Okay.                                                10:14:10
12   Q.     Would you agree that Mr. Hutchison is around         10:14:11
13   20 years younger than Maggie?                               10:14:15
14   A.     I'm sorry, I don't know exactly how old she         10:14:19
15   is.                                                         10:14:21
16                MS. LAWRENCE:  65.                             10:14:23
17                THE WITNESS:  So close.  15.  Is that          10:14:24
18   close?                                                      10:14:26
19   BY MR. BIGELOW:                                             10:14:26
20   Q.     And how old is Mr. Hutchison?                        10:14:27
21   A.     48, so 17 years.                                     10:14:28
22   Q.     17 years younger?                                    10:14:30
23   A.     Yeah.                                                10:14:31
24   Q.     Okay.  And I guess, you know, significantly         10:14:31
25   younger can be interpreted different ways, right?  17       10:14:36
```

| | |
|---|---|
| 1 | years -- that Maggie is in her mid 60s and Mr. | 10:14:41 |
| 2 | Hutchison is in his mid 40s, correct? | 10:14:44 |
| 3 | A.      Yeah. | 10:14:48 |
| 4 | Q.      Okay.  And less experience, the question | 10:14:48 |
| 5 | becomes, well, what is less experienced.  As far as | 10:14:51 |
| 6 | the fire marshal's office is concerned, would you | 10:14:54 |
| 7 | agree that Maggie has significantly more | 10:14:58 |
| 8 | experience -- significantly more experience and had | 10:15:02 |
| 9 | significantly more experience in the fire marshal's | 10:15:04 |
| 10 | office? | 10:15:06 |
| 11 | A.      Yes. | 10:15:07 |
| 12 | Q.      Okay.  In fact, prior to coming over here; | 10:15:07 |
| 13 | here being to the fire marshal's office, Mr. | 10:15:13 |
| 14 | Hutchison had no experience in the fire marshal's | 10:15:18 |
| 15 | office; is that correct? | 10:15:21 |
| 16 | A.      Not that I'm aware of. | 10:15:21 |
| 17 | Q.      So that is correct? | 10:15:22 |
| 18 | A.      I -- it may be.  I don't know the answer to | 10:15:24 |
| 19 | that. | 10:15:27 |
| 20 | Q.      Okay.  Had you ever seen him over here in the | 10:15:27 |
| 21 | fire marshal's office? | 10:15:31 |
| 22 | A.      No.  But that doesn't mean he didn't work | 10:15:31 |
| 23 | before I came there.  You know what I'm saying?  I | 10:15:34 |
| 24 | don't know that.  I want to say your answer's correct | 10:15:38 |
| 25 | but I don't know that. | 10:15:41 |

| | |
|---|---|
| 1 | Q.      Okay.  I'm gonna turn your attention to the | 10:15:41 |
| 2 | third page, please, of the complaint -- well, | 10:16:00 |
| 3 | actually, let me take a step backwards.  Did you help | 10:16:13 |
| 4 | in preparing this answer? | 10:16:17 |
| 5 | A.      Yes. | 10:16:18 |
| 6 | Q.      Okay.  Do you know of anyone else who helped | 10:16:18 |
| 7 | prepare in the answer -- | 10:16:24 |
| 8 | A.      I don't. | 10:16:26 |
| 9 | Q.      -- to these? | 10:16:26 |
| 10 | Okay.  What did you do in preparing this | 10:16:28 |
| 11 | answer?  Like what did -- aside from conversation; I | 10:16:35 |
| 12 | don't want to know about conversations you had with | 10:16:39 |
| 13 | the lawyers.  But like what did you actually do in | 10:16:40 |
| 14 | figuring out the answers to this complaint? | 10:16:43 |
| 15 | A.      You're talking about like researchwise? | 10:16:47 |
| 16 | Q.      Yeah. | 10:16:49 |
| 17 | A.      Oh.  Well, if I needed the dates, I would go | 10:16:49 |
| 18 | back and look at, you know, old e-mails.  If I had | 10:16:52 |
| 19 | the information readily available, I just used what I | 10:16:56 |
| 20 | had.  And then if I didn't know the answer, I may | 10:17:00 |
| 21 | write on there I have no idea, you know, or need to | 10:17:03 |
| 22 | get from Chief Swann, or Chief Hutchison, or Chief | 10:17:06 |
| 23 | Henderson.  But if I needed it, I would get | 10:17:09 |
| 24 | information from the person I needed the information | 10:17:11 |
| 25 | from. | 10:17:13 |

```
 1   Q.      Okay.  So if it referenced someone and if it        10:17:14
 2   said Chief Hutchison said this, you would go and           10:17:16
 3   speak with Chief Hutchison; is that correct?              10:17:19
 4   A.      Correct.                                            10:17:21
 5   Q.      Okay.  On page 3, paragraph 15 states:  For         10:17:21
 6   nearly 30 years, plaintiff did not incur any negative      10:17:39
 7   write-ups or performance reviews.  And in your -- it       10:17:44
 8   may make it easier for you to have the answer out          10:17:48
 9   next to it because that's kind of what we're gonna be      10:17:52
10   doing for the next little bit --                           10:17:55
11   A.      Okay.                                               10:17:55
12   Q.      -- just so we can sing on the same song             10:17:56
13   sheet.                                                      10:18:00
14   A.      Okay.                                               10:18:00
15   Q.      And that's admitted, correct?                       10:18:00
16   A.      Correct.                                            10:18:02
17   Q.      Okay.  And it states on paragraph 17:               10:18:02
18   Additionally, she acquired various certifications          10:18:09
19   from the National Association of Fire Investigators,       10:18:12
20   Nashville Metro Police Department, and Nashville Fire      10:18:17
21   Academy to name a few.  That's admitted as well,           10:18:21
22   correct?                                                    10:18:24
23   A.      Correct.                                            10:18:24
24   Q.      I take it you didn't know that Ms. Lawrence         10:18:30
25   was an ordained minister?                                   10:18:33
```

| | |
|---|---|
| 1 | A.      I did not. | 10:18:35 |
| 2 | Q.      Okay.  Or a volunteer disaster and spiritual | 10:18:36 |
| 3 | counsel for the American Red Cross? | 10:18:42 |
| 4 | A.      I did not. | 10:18:45 |
| 5 | Q.      Did you know that she was the chaplain for | 10:18:45 |
| 6 | both the fire department and the police department? | 10:18:48 |
| 7 | A.      I do know -- not the police department.  I do | 10:18:50 |
| 8 | know at one time that she -- and I assume that she | 10:18:56 |
| 9 | still did -- act as one of our chaplains. | 10:18:56 |
| 10 | Q.      Okay. | 10:18:59 |
| 11 | A.      Yeah. | 10:18:59 |
| 12 | Q.      Paragraph 25 states:  Mr. Hutchison was | 10:19:11 |
| 13 | brought in from another department and had never | 10:19:17 |
| 14 | worked in a fire marshal's office before.  The | 10:19:20 |
| 15 | response to that says admitted that Captain Hutchison | 10:19:25 |
| 16 | was transferred from another department and was new | 10:19:29 |
| 17 | to the fire marshal's office, correct? | 10:19:32 |
| 18 | A.      It's what it says, but I read another | 10:19:35 |
| 19 | department as outside the fire department.  And it | 10:19:38 |
| 20 | really should be another division within the | 10:19:40 |
| 21 | department but, yes, that's what it says. | 10:19:43 |
| 22 | Q.      Okay.  Paragraph number 26 says -- states: | 10:19:45 |
| 23 | He had only been an administrative captain for two | 10:19:53 |
| 24 | years at the fire -- I'm sorry -- at the training | 10:19:56 |
| 25 | academy and had not supervised anyone on a consistent | 10:19:59 |

```
 1   basis.                                                    10:20:04
 2        And the answer states admitted that Captain          10:20:07
 3   Hutchison was previously at the training academy.         10:20:11
 4   All other allegations are denied.  Did you do any         10:20:13
 5   research into whether he had supervised anyone else       10:20:18
 6   on a consistent basis?                                    10:20:21
 7   A.      Well, if he was a captain at some point, that     10:20:24
 8   is his job, to supervise.  So at the academy, they're     10:20:26
 9   not only overseeing and training the recruits, but        10:20:29
10   they're also -- they -- we have adjunct instructors       10:20:34
11   that come from the field for a daily bas- -- that         10:20:39
12   they have to oversee, tell them what to do, give          10:20:42
13   direction, supervise.  And I'm not positive, but I        10:20:44
14   thought that he was also a field captain before he        10:20:47
15   come to the academy but I could be wrong.                 10:20:50
16   Q.      Okay.  Paragraph 27 says:  He was much            10:20:52
17   younger than Ms. Lawrence and had little to no            10:20:57
18   experience in comparison to Ms. Lawrence.  The answer     10:21:00
19   says -- states admitted that Captain Hutchison is         10:21:05
20   younger than plaintiff.  All other allegations are        10:21:08
21   denied.  How would you categorize Maggie's experience     10:21:12
22   with Chief Hutchison's experience prior to him            10:21:26
23   becoming the chief?                                       10:21:30
24   A.      Well, that's not what that question says.         10:21:32
25   That says no experience in comparison.  And no            10:21:34
```

```
 1    experience in the fire marshal's office?  No        10:21:38
 2    experience in life?  I don't know.  I think that may 10:21:39
 3    be the reason that the rest of the allegations were  10:21:42
 4    denied, just because it was just so open-ended in my 10:21:46
 5    opinion.                                             10:21:49
 6         And to be -- I don't -- when -- I don't use    10:21:50
 7    this language in here.  This is Metro's attorneys'   10:21:51
 8    language.  So I would just respond back I don't know 10:21:55
 9    or I don't -- so I -- I can't -- some of this when   10:21:58
10    it's denied, I can't -- I may not be able to help    10:22:00
11    you --                                               10:22:04
12    Q.      No, that's totally fair.                     10:22:04
13    A.      -- but I'm trying.                           10:22:06
14    Q.      That's totally fair.  But what I'm asking you 10:22:07
15    is how would you compare Maggie's experience as far  10:22:10
16    as becoming the fire marshal in comparison to Chief  10:22:15
17    Hutchison's prior to be -- him becoming the fire     10:22:21
18    marshal?  How would you compare their experience?    10:22:23
19    A.      Well, he didn't work in the fire marshal's   10:22:26
20    office before I think we've stated.                  10:22:28
21    Q.      Okay.                                        10:22:29
22    A.      But I don't know what other experience that  10:22:30
23    he has outside of that when it comes to dealing with 10:22:31
24    things that would happen in the fire marshal's       10:22:35
25    office:  Permits, inspections.  I don't know what his 10:22:40
```

10:22:44
10:22:47
10:22:50
10:22:52
10:22:54
10:22:55
10:22:57
10:22:58
10:23:01
10:23:03
10:23:06
10:23:16
10:23:24
10:23:28
10:23:32
10:23:35
10:23:38
10:23:39
10:23:41
10:23:45
10:23:47
10:23:47
10:23:51
10:23:53
10:23:57

1  experience in the fire department is prior to coming

2  there so I think that's a question you'd have to ask

3  him.

4  Q.      And you're the head of HR, though, right?

5  A.      I am.

6  Q.      But you don't know what his past experience

7  is?

8  A.      No.  We have 1500 employees so it's -- I

9  don't keep up with what everybody did.  I don't know

10 what Chief Hutch- -- I mean Chief Henderson did, you

11 know, ten years before he became the deputy chief.

12 Q.      Paragraph 29 states that Chief Swann

13 instructed then Fire Marshal Al Thomas to introduce

14 Mr. Hutchison to the fire marshal office staff and

15 allow Mr. Hutchison to shadow him for six months.

16 And the answer was admitted, correct?

17 A.      Correct.

18 Q.      I want to -- I want to go back just for a

19 second -- I'm sorry to digress -- to this

20 construction business.  How did you learn about this

21 construction business?

22 A.      Just 'cause I've -- we've talked about it

23 before.  He would say I used to own a construction

24 business.  And I know that he built houses with

25 other -- with another employee that worked here.  I

```
 1   didn't know that until he came up here --                    10:23:59

 2   Q.      Okay.                                                 10:24:01

 3   A.      -- but that's just conversations we've had in        10:24:01

 4   the past.  Otherwise, I wouldn't have known.                 10:24:03

 5   Q.      I gotcha.  Do you know the other employee who        10:24:05

 6   owned the construction business with him -- or worked        10:24:08

 7   with him?  I'm sorry.                                        10:24:09

 8   A.      I don't know if they owned separate                  10:24:10

 9   businesses or just built houses together, but Daryl          10:24:12

10   King is one of the -- is the other guy, but I don't          10:24:15

11   know --                                                      10:24:17

12   Q.      And does Mr. King work for the fire marshal's        10:24:17

13   office?                                                      10:24:20

14   A.      No.  He works in field operations.  He's a          10:24:20

15   district chief.                                              10:24:24

16   Q.      Do you know if Mr. King and the chief know           10:24:32

17   each other?                                                  10:24:51

18   A.      Which chief?                                         10:24:52

19   Q.      Your chief.                                          10:24:52

20   A.      Swann?                                               10:24:53

21   Q.      Swann.                                               10:24:54

22   A.      Yes, they know each other, I'm sure.                 10:24:55

23   Q.      Okay.  When it came to the qualifications to        10:25:03

24   become the -- are you familiar with the                     10:25:30

25   qualifications that are required to become the fire          10:25:32
```

```
 1   marshal?                                              10:25:36

 2   A.      From the State?                               10:25:36

 3   Q.      Yes, ma'am.                                   10:25:37

 4   A.      Kind of.  I've read it.                       10:25:38

 5   Q.      Okay.  Can you explain that?                  10:25:41

 6   A.      I think you have to have your fire inspector  10:25:42

 7   license.  And I think you have to have a 40- or       10:25:45

 8   80-hour course, or maybe that's what it is to get     10:25:47

 9   your license, but you've got to have that and then be 10:25:51

10   appointed by the chief --                             10:25:54

11   Q.      Okay.                                         10:25:54

12   A.      -- and work at the fire department.  I don't  10:25:55

13   think we can hire somebody who doesn't work -- I      10:25:58

14   mean, I don't think we can appoint a layperson who    10:26:01

15   doesn't work for the fire department but I don't know 10:26:04

16   the exact...                                          10:26:07

17   Q.      Okay.  Do you know what bugles are?           10:26:08

18   A.      Yes.                                          10:26:13

19   Q.      What are they?                                10:26:13

20   A.      They're their bugles that they wear on their  10:26:15

21   collar, that chiefs do, chief officers.  So -- and    10:26:19

22   each one bugle stands for each level of supervision.  10:26:20

23   Q.      Do you know if the qualifications to become   10:26:25

24   the fire marshal requires a certain number of bugles? 10:26:29

25   A.      I've never heard that.                        10:26:33
```

| | | |
|---|---|---|
| 1 | Q.     Okay.  I'm gonna turn your attention to | 10:26:38 |
| 2 | paragraph 30.  Paragraph 30 states:  Chief Swann | 10:26:53 |
| 3 | planned for Mr. Hutchison to succeed Mr. Thomas as | 10:27:01 |
| 4 | fire marshal.  And you denied that; is that true? | 10:27:07 |
| 5 | A.     That's what it says, yes. | 10:27:12 |
| 6 | Q.     Well, why did you deny that? | 10:27:13 |
| 7 | A.     I do not know.  I don't know why -- I mean, I | 10:27:16 |
| 8 | don't remember the -- what was said, but it looks | 10:27:19 |
| 9 | like we denied it all the way through 36, so it looks | 10:27:21 |
| 10 | like it was denied as a group.  Let's see.  I think | 10:27:26 |
| 11 | you'd have to go all the way down. | 10:27:29 |
| 12 | Q.     Well, I'm just gonna take one by one.  Based | 10:27:31 |
| 13 | on what you're saying -- and I'm not trying to put | 10:27:35 |
| 14 | words in your mouth -- would you agree that that's | 10:27:38 |
| 15 | true? | 10:27:40 |
| 16 | A.     No, I don't think he knew.  I think that's | 10:27:40 |
| 17 | the reason that he brought him up here, to put him | 10:27:42 |
| 18 | under -- to shadow Chief Thomas.  I don't think he | 10:27:44 |
| 19 | knew that that's what he wanted to do.  But he wanted | 10:27:47 |
| 20 | to bring him in there and start looking at what kind | 10:27:49 |
| 21 | of plan we had. | 10:27:49 |
| 22 | For all we know, Mr. Hutchison could have got | 10:27:53 |
| 23 | down there and been like this is a mess, I don't want | 10:27:55 |
| 24 | any part of it, I'm out, you know, so we just don't | 10:27:57 |
| 25 | really know what his plan was.  I don't, at least. | 10:28:01 |

10:28:04
10:28:08
10:28:09
10:28:14
10:28:15
10:28:19
10:28:21
10:28:22
10:28:23
10:28:26
10:28:28
10:28:31
10:28:31
10:28:35
10:28:38
10:28:41
10:28:43
10:28:44
10:28:45
10:28:49
10:28:51
10:28:54
10:28:56
10:28:59
10:28:59

1  He may have wanted to see -- he may, for all I know,

2  have brought in somebody else six months after that

3  and had them shadow Chief Thomas to get an idea of

4  maybe had a -- was the best fit.

5  Q.      Did you ask Chief Swann if he had planned for

6  Mr. Hutchison to succeed Mr. Thomas as fire marshal?

7  A.      I did not.

8  Q.      Well, why not?

9  A.      Because Chief makes the decisions and he puts

10  people where he wants them.  It's not my place to

11  tell him not to do that.  He's the chief.  He's my

12  boss too.

13  Q.      But that's what this claims, though, right?

14  This sentence claims that he had planned for Mr.

15  Hutchison to succeed Mr. Thomas as fire marshal.

16  A.      That's what you say it claims, right?

17  Q.      Correct.

18  A.      Okay.

19  Q.      And the only person who would know those

20  plans is Chief Swann, correct?

21  A.      Him and possibly Chief Henderson if they

22  discussed it but, yeah.

23  Q.      Well, this specific sentence says that Chief

24  Swann planned that.  So the only person --

25  A.      Okay.

| | | |
|---|---|---|
| 1 | Q.     -- who would know that was Chief Swann, | 10:29:00 |
| 2 | correct? | 10:29:03 |
| 3 | A.     Yes. | 10:29:03 |
| 4 | Q.     And you're saying you didn't talk to Chief | 10:29:04 |
| 5 | Swann about that? | 10:29:06 |
| 6 | A.     No, not in the beginning. I didn't have -- | 10:29:07 |
| 7 | when they decided -- Chief Swann, Chief Henderson, | 10:29:09 |
| 8 | whoever brought Chief Hutchison downstairs, I did not | 10:29:13 |
| 9 | know until the motion was put in place. And so, no, | 10:29:16 |
| 10 | I did not talk to him and say is it your plan if | 10:29:19 |
| 11 | you're bringing him down to succeed Al Thomas. | 10:29:21 |
| 12 | Q.     Let me be more clear. | 10:29:24 |
| 13 | A.     Okay. | 10:29:26 |
| 14 | Q.     I'm sorry I'm not very clear. You said | 10:29:26 |
| 15 | earlier that as far as you know, you were the only | 10:29:28 |
| 16 | one, only person, who helped prepare these answers, | 10:29:31 |
| 17 | correct? | 10:29:34 |
| 18 | A.     Correct. | 10:29:35 |
| 19 | Q.     So in preparing these answers -- I'm not | 10:29:35 |
| 20 | saying prior to that. In preparing these answers, | 10:29:37 |
| 21 | the allegation was that Chief Swann planned for Mr. | 10:29:40 |
| 22 | Hutchison to succeed Mr. Thomas as fire marshal. | 10:29:45 |
| 23 | That was the allegation, correct? | 10:29:48 |
| 24 | A.     That's the allegation, correct. | 10:29:50 |
| 25 | Q.     Now, you were the point person to answer that | 10:29:51 |

| | | |
|---|---|---|
| 1 | allegation, correct? | 10:29:55 |
| 2 | A.     I -- well, to give my input but, yes. | 10:29:56 |
| 3 | Q.     Right.  But you're saying now that you never | 10:29:59 |
| 4 | even asked Chief Swann. | 10:30:02 |
| 5 | A.     Well, I don't know that I even answered that | 10:30:03 |
| 6 | question.  I mean, that -- I -- I don't know that.  I | 10:30:05 |
| 7 | would have to talk to my legal counsel to see if | 10:30:07 |
| 8 | that's something I provided an answer for.  As I | 10:30:10 |
| 9 | stated earlier, some of those, I don't have answers | 10:30:12 |
| 10 | for and I just move on and will either leave them | 10:30:15 |
| 11 | blank or just give an example of what I know that | 10:30:17 |
| 12 | happened.  I don't write word for word each one of | 10:30:21 |
| 13 | these.  No, I don't do that but I do have input. | 10:30:25 |
| 14 | Q.     I promise you I'm not trying to be difficult. | 10:30:30 |
| 15 | All I'm saying is this:  There is a lot of | 10:30:32 |
| 16 | allegations in here that do not have to deal with | 10:30:40 |
| 17 | what you personally know or don't know, correct? | 10:30:45 |
| 18 | A.     Correct. | 10:30:48 |
| 19 | Q.     And those allegations require you -- well, | 10:30:49 |
| 20 | would you agree that those allegations require you to | 10:30:55 |
| 21 | go ask other people and find the answers? | 10:30:58 |
| 22 | A.     They could if I had the answers.  I don't | 10:31:01 |
| 23 | know -- what I'm saying is -- and I'm not trying to | 10:31:03 |
| 24 | be difficult -- is I would have to look at what I | 10:31:05 |
| 25 | provided Metro Legal to see if I answered that | 10:31:08 |

```
 1   question independently, or if I grouped them                10:31:11
 2   together, or if I read them as one whole paragraph          10:31:15
 3   and wrote a paragraph on it.  I don't know.                 10:31:18
 4        I don't know if I asked Chief Swann if it was          10:31:20
 5   his plan to have Al Thomas when I wrote this.  I            10:31:22
 6   don't know if Mr. Thomas told Chief Swann that Ms.          10:31:28
 7   Lawrence was ideal for the position; not Hutchison.         10:31:31
 8   I don't know any of that as fact.  I don't                  10:31:34
 9   personally.                                                 10:31:36
10   Q.     Okay.  But what -- but it's your -- would you        10:31:37
11   agree that it's your job in the fact that you were          10:31:40
12   the only person to answer the -- help Metro answer          10:31:42
13   these questions to find out whether this is fact or         10:31:46
14   not?                                                        10:31:48
15   A.     If I -- if I didn't have the answer for it,          10:31:49
16   but I don't know that I had the answer.  I would have       10:31:52
17   to go back and look.  I don't really know how to            10:31:54
18   answer your question.  I'm not trying to be                 10:31:57
19   difficult.  I'm --                                          10:31:59
20   Q.     I'm not saying you are.                              10:31:59
21   A.     -- telling you, I don't know but -- I don't          10:32:00
22   know.  Chief Swann would have been the one to -- I          10:32:02
23   did not sit with him if that's what you're asking and      10:32:04
24   go down these one by one and ask if he --                   10:32:07
25   Q.     Why not?                                             10:32:09
```

```
 1   A.      I didn't do that.  Because I didn't.           10:32:10

 2   Q.      Why not?                                        10:32:11

 3   A.      I don't know how to answer that.  Because I     10:32:12

 4   didn't.                                                 10:32:13

 5   Q.      Okay.  So let's -- and this is not what any     10:32:13

 6   of this said.  But let's pretend that you're            10:32:16

 7   answering -- helping Metro answer a lawsuit where it    10:32:20

 8   said John -- at that point, John Smith who was a        10:32:23

 9   Metro employee at the fire department punched Susie     10:32:28

10   Smith in the face.  Right?  Let's just pretend that's   10:32:32

11   the allegation, right?                                  10:32:38

12   A.      Okay.                                           10:32:38

13   Q.      And you were the point person to answer the     10:32:39

14   lawsuit, right?                                         10:32:41

15   A.      Right.                                          10:32:42

16   Q.      Would you agree that it's your duty to go to    10:32:42

17   John Smith who works for your department and say,       10:32:46

18   John Smith, Dear John, did you punch Susie in the       10:32:50

19   face?                                                   10:32:54

20   A.      Well, I would think if that were the case we    10:32:55

21   would have something -- kind of disciplinary action     10:32:57

22   or something that I would have the facts for already.   10:32:58

23   This, to me, is a subjective statement that's saying    10:33:02

24   Chief Swann had predetermined what he was doing         10:33:05

25   already, and I don't know the answer to that.  And      10:33:08
```

| | |
|---|---|
| 1 | that's what I'm telling you now still. | 10:33:10 |
| 2 | Q.    I understand that.  But -- okay.  Let me -- | 10:33:12 |
| 3 | let me give you a different -- let's pretend -- let's | 10:33:22 |
| 4 | pretend that instead of punch someone in the face it | 10:33:28 |
| 5 | was an allegation that one of your employees lit a | 10:33:35 |
| 6 | building on fire.  Okay? | 10:33:43 |
| 7 | A.    (Nods head affirmatively.) | 10:33:47 |
| 8 | Q.    And in -- in that, in the complaint, it said | 10:33:48 |
| 9 | that -- let's say the guy's name is Smith just | 10:33:52 |
| 10 | because -- Mr. Smith had told employees at the fire | 10:33:57 |
| 11 | department that he was going to light the building on | 10:34:02 |
| 12 | fire prior to lighting the building on fire.  Is that | 10:34:05 |
| 13 | fair?  Are we on the same page? | 10:34:10 |
| 14 | A.    Sure.  Yeah. | 10:34:12 |
| 15 | Q.    Would you agree that if you were the only | 10:34:12 |
| 16 | person from Metro to answer that complaint and it | 10:34:15 |
| 17 | said that Mr. Smith had told other Metro employees | 10:34:17 |
| 18 | that he had planned on lighting it on fire, you | 10:34:23 |
| 19 | should have gone up to Mr. Smith in your | 10:34:25 |
| 20 | investigation as the Metro representative and said, | 10:34:28 |
| 21 | Mr. Smith, did you tell other people that you planned | 10:34:31 |
| 22 | on lighting the building on fire? | 10:34:34 |
| 23 | A.    And in that case, yes, I would have -- | 10:34:36 |
| 24 | Q.    Okay. | 10:34:38 |
| 25 | A.    -- if that's what you're asking.  But I would | 10:34:38 |

```
 1   have --                                                    10:34:38

 2   Q.      That's what I'm asking.                            10:34:39

 3   A.      But I would have already done an                   10:34:39

 4   investigation so I already have all these facts,           10:34:41

 5   right?                                                     10:34:41

 6   Q.      Okay.                                              10:34:41

 7   A.      So --                                              10:34:43

 8   Q.      Let me make it even easier.  Would you agree       10:34:44

 9   what you should have done was gone up to Chief Swann       10:34:44

10   and said, hey, Chief Swann, based on this complaint,       10:34:48

11   did you plan for Mr. Hutchison to succeed Mr. Thomas?      10:34:50

12   A.      Yes.                                               10:34:55

13   Q.      Okay.  Thank you.  That should have been a --      10:34:55

14   A.      Okay.                                              10:34:55

15   Q.      That should have been a whole lot easier and       10:34:57

16   that's my apologies.                                       10:34:58

17   A.      Okay.                                              10:35:00

18   Q.      Okay.  Paragraph 31:  Mr. Thomas instead told      10:35:00

19   Chief Swann that Ms. Lawrence was ideal for the            10:35:05

20   position; not Mr. Hutchison.  And you denied that,         10:35:09

21   correct?                                                   10:35:12

22   A.      Correct.                                           10:35:12

23   Q.      32:  Ms. Lawrence had given a copy of her          10:35:13

24   résumé to Chief Thomas, along with other candidates,       10:35:17

25   for presentation to Chief Swann in determining who to      10:35:21
```

| | | |
|---|---|---|
| 1 | promote to fire marshal.  And you denied that, | 10:35:24 |
| 2 | correct? | 10:35:27 |
| 3 | A.     Correct. | 10:35:27 |
| 4 | Q.     Do you know of any other candidates who had | 10:35:29 |
| 5 | wanted to become fire marshal? | 10:35:33 |
| 6 | A.     I don't. | 10:35:35 |
| 7 | Q.     Okay.  Do you know that Ms. Lawrence had | 10:35:35 |
| 8 | wanted to become fire marshal? | 10:35:39 |
| 9 | A.     I did not. | 10:35:40 |
| 10 | Q.     Okay.  When did you learn of that? | 10:35:42 |
| 11 | A.     About the time that she filed her EEO | 10:35:45 |
| 12 | complaint for not becoming the fire marshal.  And it | 10:35:48 |
| 13 | may have been sooner.  It may have been when she | 10:35:50 |
| 14 | contacted News Channel 4 about why she didn't get to | 10:35:53 |
| 15 | be the fire marshal. | 10:35:58 |
| 16 | Q.     Okay.  Paragraph 33:  After telling Chief | 10:35:58 |
| 17 | Swann that Ms. Lawrence was the best candidate for | 10:36:01 |
| 18 | fire marshal, Mr. Thomas was subsequently put on paid | 10:36:04 |
| 19 | administrative leave and subject to an investigation. | 10:36:08 |
| 20 | And that was denied, correct? | 10:36:10 |
| 21 | A.     Correct. | 10:36:12 |
| 22 | Q.     Okay.  Why was Mr. Thomas put on | 10:36:12 |
| 23 | administrative leave? | 10:36:16 |
| 24 | A.     For a multitude of issues that he had -- had | 10:36:17 |
| 25 | regarding his tenure as the fire marshal.  I mean, | 10:36:21 |

| | |
|---|---|
| 1 | had multiple issues, but the main one being | 10:36:26 |
| 2 | insubordinate.  He was subsequently brought up on | 10:36:30 |
| 3 | charges for a multitude of things and terminated and | 10:36:34 |
| 4 | then requested to have that changed to a resigned in | 10:36:36 |
| 5 | lieu of termination on his file and took his pension. | 10:36:39 |
| 6 | But it was insubordination, failure to follow direct | 10:36:43 |
| 7 | orders, inefficiencies of duties, host of other | 10:36:48 |
| 8 | reasons.  But it all started with the -- he had to be | 10:36:51 |
| 9 | put on administrative leave because of -- subject to | 10:36:52 |
| 10 | getting this -- wasn't -- per an investigation, it | 10:36:55 |
| 11 | was in relating to having a disciplinary hearing so. | 10:36:58 |
| 12 | Q.     Did Chief Swann ever name himself the interim | 10:37:02 |
| 13 | fire marshal? | 10:37:06 |
| 14 | A.     I believe so. | 10:37:06 |
| 15 | Q.     Okay.  And did he ever put Ms. Lawrence in | 10:37:08 |
| 16 | control of the daily operations? | 10:37:10 |
| 17 | A.     I believe so. | 10:37:12 |
| 18 | Q.     Okay.  If that is true, then why was | 10:37:13 |
| 19 | paragraph 35 denied? | 10:37:18 |
| 20 | A.     I have no idea. | 10:37:23 |
| 21 | Q.     So that should have been admitted based on | 10:37:25 |
| 22 | what you just said? | 10:37:30 |
| 23 | A.     I would have to do some more research, but I | 10:37:31 |
| 24 | think that's what's been said.  So I'll have to look | 10:37:34 |
| 25 | at that for sure. | 10:37:38 |

```
 1   Q.      Okay.                                          10:37:39

 2   A.      But I can.  I can do that.                     10:37:40

 3   Q.      When Ms. Lawrence was put in control of the    10:37:44

 4   department's daily operations --                       10:37:48

 5   A.      Can I stop you?  I know you're right in the    10:37:49

 6   middle of this, but it may have been denied at number  10:37:52

 7   36.  I'm not -- because they're lumped together.       10:37:55

 8   That may have been the reason for the denial.          10:37:58

 9   Q.      Well, to be -- to be fair, in Metro's answer,  10:38:00

10   it's -- on page 2, it says numbers 30 through 36 are   10:38:03

11   denied.                                                10:38:08

12   A.      Okay.  Yeah.  So I don't know all the -- but   10:38:09

13   I can check on number 35 is what I was trying to say.  10:38:12

14   But I'm sorry for interrupting you.                    10:38:19

15   Q.      No, that's okay.  I want to just get the       10:38:19

16   facts.                                                 10:38:23

17   A.      Okay.  I'm ready.                              10:38:23

18   Q.      You just testified that you were aware that    10:38:25

19   at some point Ms. Lawrence was in control of the       10:38:26

20   department's daily operations, correct?                10:38:30

21   A.      I think that's true, yes.                      10:38:32

22   Q.      Okay.                                          10:38:34

23   A.      But I want to -- I'm gonna double check        10:38:40

24   'cause I want to make sure what I'm telling you for a  10:38:44

25   fact.                                                  10:38:47
```

```
 1    Q.      The next attention -- I'm sorry, not -- two     10:38:47
 2    down.  Number 37 states:  On October 23rd, 2020 --      10:38:51
 3              MR. PUCKETT:  Objection.  I think that's       10:38:55
 4    November 23rd, just --                                  10:38:57
 5              MR. BIGELOW:  I'm sorry?                       10:39:00
 6              MR. PUCKETT:  November 23.                     10:39:01
 7              MR. BIGELOW:  Oh, my apologies.  Thank         10:39:03
 8    you for correcting me.                                  10:39:05
 9              MR. PUCKETT:  Yep.                             10:39:06
10    BY MR. BIGELOW:                                          10:39:06
11    Q.      On November 23, 2020, a meeting was held with   10:39:07
12    a number of executives in the fire department.  And     10:39:09
13    that was admitted, correct?                             10:39:11
14    A.      Correct.                                         10:39:12
15    Q.      And do you remember that meeting?               10:39:12
16    A.      I do.                                            10:39:13
17    Q.      And you were there, correct?                    10:39:14
18    A.      I was.                                           10:39:16
19    Q.      And other people there include Ms. Lawrence,    10:39:17
20    Deputy Director Henderson, Deputy Director Tomlinson.    10:39:21
21    And who else?                                            10:39:26
22    A.      I think Chief Hutchison was in there.  I        10:39:28
23    think Mike Robinson -- the Assistant Fire Marshal        10:39:31
24    Mike Robinson, Assistant Fire Marshal Andrea Eanes.      10:39:35
25    I know them for a fact.  Me, Maggie.  I'm not sure       10:39:42
```

1   who else, but I know that all of us were 'cause we          10:39:48

2   were in the blue -- in that room down there.                10:39:50

3   Q.      Was there any notification?  Like, how did          10:39:52

4   you learn about that meeting?                               10:39:54

5   A.      Oh, I don't remember.  He probably called and       10:39:56

6   said come to the office for all -- come to the blue         10:39:58

7   room for all I know.                                        10:40:01

8   Q.      When you say he, who are you talking about?         10:40:02

9   A.      Chief Henderson.                                    10:40:06

10  Q.      Okay.  And that point, he was the deputy            10:40:06

11  director?                                                   10:40:08

12  A.      Yes.                                                10:40:08

13  Q.      Okay.  What was your understanding as to why        10:40:09

14  that meeting was called?                                    10:40:11

15  A.      Well, I didn't know at first, but I quickly         10:40:12

16  learned what it was, is -- when we were in there,           10:40:14

17  Chief Swann -- so Chief Thomas had just either been         10:40:19

18  put on administrative leave that day, or maybe right        10:40:22

19  before that, or maybe we had his hearing.  I don't          10:40:25

20  remember the sequence of events.                            10:40:29

21          But even leading up to that -- and I think a        10:40:33

22  lot of it started with Al Thomas basically                  10:40:37

23  campaigning outside of the department for who would         10:40:40

24  take over should he leave or not become the fire            10:40:45

25  marshal.  He had had meetings with the director of         10:40:48

| | | |
|---|---|---|
| 1 | codes.  Chief Swann had had phone calls and e-mails | 10:40:50 |
| 2 | from council members, people in the mayor's office | 10:40:55 |
| 3 | questioning where the fire marshal was, and who was | 10:41:00 |
| 4 | gonna take over, and things like that, and he had | 10:41:04 |
| 5 | just had enough of it. | 10:41:07 |
| 6 | And so Chief Henderson had that meeting to | 10:41:08 |
| 7 | let people know that the chief names the fire marshal | 10:41:13 |
| 8 | and he's the one that decides who's gonna be the fire | 10:41:16 |
| 9 | marshal.  And he is being bombarded unnecessarily | 10:41:20 |
| 10 | with this outside influence and he didn't want to | 10:41:23 |
| 11 | hear it anymore.  That's what it was sub- -- | 10:41:26 |
| 12 | ultimately about. | 10:41:28 |
| 13 | Q.    Was he upset? | 10:41:29 |
| 14 | A.    Yeah, he was mad. | 10:41:30 |
| 15 | Q.    Did he swear a lot? | 10:41:32 |
| 16 | A.    Once. | 10:41:34 |
| 17 | Q.    He swore once? | 10:41:34 |
| 18 | A.    One time. | 10:41:35 |
| 19 | Q.    Okay. | 10:41:36 |
| 20 | A.    Yeah. | 10:41:36 |
| 21 | Q.    And what did he say when he swore? | 10:41:37 |
| 22 | A.    I think he said I'm f'ing tired of it. | 10:41:40 |
| 23 | That's when he used the f-word. | 10:41:43 |
| 24 | Q.    Okay.  So paragraph 40 states:  During the | 10:41:45 |
| 25 | meeting, Deputy Henderson said that he was, quote, | 10:41:51 |

```
 1   fucking tired of people going to the mayor's office        10:41:55

 2   and to their council person, end quote, to talk about      10:42:00

 3   what was going on in the fire department.  Is that         10:42:03

 4   correct?                                                   10:42:06

 5   A.      That's what that says.                             10:42:06

 6   Q.      Did you --                                         10:42:07

 7   A.      That's not how that conversation went.  He         10:42:08

 8   did say he was tired of people going, but he did not       10:42:11

 9   say fucking tired.  He only said the f-word one time.      10:42:15

10   Because even I -- I remember thinking, oh, man,            10:42:20

11   'cause he doesn't do that a lot and so it did shock        10:42:22

12   me.  But he used the f-word one time in that meeting.      10:42:24

13   Q.      Okay.  But just to be clear, just a moment         10:42:28

14   ago, I believe you said that he only said it one time      10:42:30

15   and it was that he was fucking tired of people going       10:42:33

16   to, right?                                                 10:42:37

17   A.      No.  I said he was fucking tired of it.            10:42:38

18   Q.      Of it?                                             10:42:40

19   A.      Of it.                                             10:42:41

20   Q.      Okay.                                              10:42:42

21   A.      Like the whole situation.  He was tired of         10:42:42

22   it.  He said I'm fucking tired of it (indicating),         10:42:45

23   just that like that.                                       10:42:49

24   Q.      Okay.  I mean, it's a small and maybe              10:42:50

25   insignificant point, but are there any rules against       10:42:53
```

```
 1    swearing or, no?                                              10:42:57
 2    A.      There may be a Civil Service rule about              10:42:59
 3    swearing.  I'd have to look at it specifically but --        10:43:02
 4    Q.      Okay.                                                 10:43:05
 5    A.      -- I don't know that anybody's ever been             10:43:05
 6    brought up on charges for it.                                 10:43:09
 7    Q.      Okay.  Paragraph 41 states:  He also said he         10:43:11
 8    knew it was coming from, quote, someone in the               10:43:20
 9    fucking fire department, end quote, and it had to            10:43:23
10    stop now.  That's not true, you're saying?                   10:43:28
11    A.      I didn't hear him say -- I heard him say the         10:43:30
12    f-word one time.  He did say he knew it was coming           10:43:35
13    from somebody in the department or it was coming from        10:43:37
14    the people in the department and he was tired of it;         10:43:39
15    he wanted it to stop, but he didn't continually swear        10:43:42
16    the entire meeting.                                           10:43:45
17    Q.      Okay.                                                 10:43:48
18    A.      And he --                                             10:43:48
19    Q.      Could your recollection be wrong?  Like if          10:43:49
20    there was an audio recording, could your recollection       10:43:51
21    be wrong?                                                     10:43:54
22    A.      It could be.                                          10:43:55
23    Q.      Okay.                                                 10:43:55
24    A.      Yeah.                                                 10:43:56
25    Q.      So the answers to this was based on your            10:43:56
```

```
 1   recollection; is that correct?                        10:43:59

 2   A.      Correct.                                       10:44:01

 3   Q.      Okay.                                          10:44:01

 4   A.      Yeah.                                          10:44:02

 5   Q.      Paragraph 42 states:  He promised to fire      10:44:04

 6   whoever was complaining as soon as he found out who    10:44:07

 7   it was.                                                10:44:10

 8   A.      I --                                           10:44:13

 9   Q.      Again, 42.                                     10:44:14

10   A.      That is not my recollection, but I don't       10:44:16

11   remember.  It -- I think he could have said something  10:44:20

12   along the lines of I could -- you could be fired if    10:44:23

13   we find out who it was or something.  'Cause there's   10:44:26

14   a charter requirement that says, basically, you can't  10:44:29

15   campaign for a job, you can't go out and have          10:44:32

16   people -- have undue influence on people and I think   10:44:36

17   that's what he was referring to.                       10:44:39

18   Q.      Okay.  The next paragraph, 43:  States Deputy  10:44:40

19   Henderson also reminded everyone that Chief Swann can  10:44:50

20   hire, quote, whomever he fucking wants, end quote, to  10:44:53

21   be the fire marshal.                                   10:44:59

22   A.      Yeah.  Mine is the f- -- I think the f-word    10:44:59

23   is the kicker in that, but he probably said in that    10:45:02

24   meeting he can put anybody he wants to be the fire     10:45:07

25   marshal in there.                                      10:45:09
```

```
 1   Q.     Okay.  But you're just saying you're denying      10:45:09
 2   it because of the f-word?                                 10:45:13
 3   A.     F-word.                                            10:45:14
 4   Q.     You don't remember him saying it?                  10:45:14
 5   A.     I do not.                                          10:45:17
 6   Q.     Okay.  Do you recall Deputy Henderson              10:45:17
 7   snapping at Ms. Lawrence when she asked what it was       10:45:20
 8   all about?                                                10:45:23
 9   A.     I do not.                                          10:45:24
10   Q.     Okay.  Could it have happened?                     10:45:25
11   A.     It could have but I don't -- I don't --            10:45:27
12   Q.     You just don't recall that?                        10:45:29
13   A.     -- recall that.  Huh-uh.                           10:45:31
14   Q.     Okay.                                              10:45:31
15   A.     Not directed to Chief Henderson, no.               10:45:32
16   Q.     Do you remember Chief Swann warning Ms.            10:45:35
17   Lawrence that if she goes outside the department and     10:45:38
18   starts running her mouth stating things that are         10:45:41
19   negative it's gonna come back to him anyway?             10:45:44
20   A.     He did make that statement that that -- that      10:45:48
21   that conversation had happened, but I don't know in      10:45:51
22   what context it was.                                     10:45:52
23   Q.     So he did say that but it may not have been       10:45:54
24   word for word?                                           10:45:58
25   A.     Well, I don't know if it was quoted that          10:45:58
```

```
 1    properly or how so -- but I don't know -- and I don't    10:46:01
 2    know in what context it was done -- said either.  So,    10:46:03
 3    no, I don't know if it was quoted verbatim or not.       10:46:06
 4    Q.     But he did say something along those lines is      10:46:10
 5    what you're saying?                                       10:46:13
 6    A.     Yeah.  I think he just said like if you go         10:46:13
 7    and tell other people that this is gonna happen, I'll     10:46:16
 8    find out about it, you know.  I think there's --          10:46:20
 9    Q.     Do you take -- did you take -- would you take      10:46:20
10    that as a warning --                                      10:46:22
11    A.     No.                                                10:46:23
12    Q.     -- like not to do it?                              10:46:23
13    A.     Oh, as a warning?                                  10:46:25
14    Q.     Yeah.                                              10:46:26
15    A.     I would just take it as a I told you -- if         10:46:26
16    you -- if you do it, I'll find out; like that's what     10:46:29
17    he was basically saying.                                  10:46:32
18    Q.     But the warning was don't go doing it because     10:46:34
19    I'm gonna find out, right?  I mean, that's --             10:46:38
20    A.     Sure.                                              10:46:40
21    Q.     Okay.  And the next week, Ms. Lawrence was         10:46:41
22    asked to let Mr. Hutchison shadow her, correct?  I        10:46:46
23    believe that's admitted.                                  10:46:53
24    A.     We admitted -- it is but I want to go back.       10:46:53
25    I don't know the -- on number 45 and 46 --                10:46:53
```

```
 1   Q.      Uh-huh.                                      10:47:00
 2   A.      -- I don't know the chronological events of  10:47:01
 3   those with the shadowing of Hutchison and Maggie.  I 10:47:04
 4   don't know the chronological events of all that.     10:47:08
 5   Q.      Okay.                                        10:47:11
 6   A.      So that's all.                               10:47:12
 7           Can I have -- can we take a quick restroom   10:47:16
 8   break?                                               10:47:19
 9   Q.      Of course, as promised.                      10:47:24
10           (Short break.)                               10:47:27
11           MR. BIGELOW:  Okay.  Let's get back on       10:52:38
12   the record.                                          10:52:42
13   BY MR. BIGELOW:                                      10:52:42
14   Q.      I believe where we were was kind of paragraph 10:52:44
15   46, correct, of the complaint?                       10:52:51
16   A.      Yes.                                         10:52:53
17   Q.      I want to go to the very next paragraph which 10:52:54
18   is paragraph 47.  It states that on January 27th,   10:52:57
19   2021, a meeting was held in Chief Swann's office.    10:53:04
20   And that's -- that was admitted, correct?            10:53:09
21   A.      Yes.                                         10:53:12
22   Q.      Did you speak with Chief Swann about this    10:53:12
23   part, about the meeting?                             10:53:15
24   A.      Well, it was on his calendar --              10:53:17
25   Q.      Okay.                                        10:53:20
```

```
 1   A.       -- I think.  I knew that that meeting          10:53:20
 2   happened, but I don't know how I -- how I knew that      10:53:23
 3   it happened.  And ended up, it was on that date but,     10:53:26
 4   obviously, I did if we admitted it.  I just didn't       10:53:28
 5   know the date.                                           10:53:32
 6   Q.       Okay.  Did you speak with Chief Swann           10:53:32
 7   generally about all the allegations?  I know there --    10:53:35
 8   with regards to you -- one of them, clearly, you         10:53:38
 9   didn't you had testified to.  But did you have a         10:53:41
10   meeting with him with regards to these allegations?      10:53:43
11   A.       I don't know that I had a meeting with him.     10:53:46
12   I may have got some of these dates and stuff when I      10:53:48
13   was responding initially to the EEOC complaint and       10:53:52
14   that I took some of the information out of that for       10:53:56
15   this.                                                    10:53:59
16   Q.       Okay.  But you --                               10:53:59
17   A.       More -- more likely what happened.              10:54:01
18   Q.       But you don't ever remember actually meeting    10:54:02
19   with him about this --                                   10:54:05
20   A.       No.                                             10:54:07
21   Q.       -- is that fair?                                10:54:07
22   A.       That's fair.                                    10:54:07
23   Q.       Okay.  In retrospect, do you think you should   10:54:09
24   have?                                                    10:54:12
25   A.       Probably, yes.                                  10:54:12
```

```
 1   Q.      Okay.  It's hard -- I mean, do you think it's        10:54:13
 2   difficult to kind of meet with your boss about such         10:54:20
 3   things?                                                     10:54:25
 4   A.      Do I think it's difficult?                          10:54:25
 5   Q.      Yeah.                                                10:54:27
 6   A.      No.                                                  10:54:27
 7   Q.      Okay.                                                10:54:29
 8   A.      Yeah, no.                                            10:54:29
 9   Q.      Did you not do it just because you had so            10:54:29
10   much going?                                                 10:54:34
11   A.      I have no idea.  It could have been I thought        10:54:35
12   that I had all the pertinent information already            10:54:39
13   available and so I didn't see any need to do that.          10:54:41
14   It could be that I had so much going on during all          10:54:44
15   this.  This might be close to the third lawsuit that        10:54:46
16   we were involved in, you know, about different              10:54:48
17   things, so they all kind of run together at some            10:54:51
18   point.                                                      10:54:54
19   Q.      Okay.  Paragraph 48 states:  During this            10:54:55
20   meeting, Ms. Lawrence was informed that the promotion       10:55:06
21   went to Mr. Hutchison instead of her.  And Metro's          10:55:11
22   response is that -- denied that the transfer was a          10:55:16
23   promotion; admitted that Lawrence was appointed.            10:55:20
24   A.      Correct.                                            10:55:26
25   Q.      Do you deny that going from a deputy fire           10:55:33
```

```
 1   marshal to a fire marshal would be a promotion?                    10:55:40
 2   A.      Well, it -- not in the way you're stating.                 10:55:47
 3   So a promotion in the department has to be posted.                 10:55:49
 4   And we'd already determined that he was not promoted.              10:55:54
 5   He was appointed as the fire marshal.                              10:55:57
 6   Q.      Oh, you're saying that since Chief                         10:56:08
 7   Hutchison -- now Chief Hutchison was appointed, it                 10:56:20
 8   wasn't a promotion?                                                10:56:25
 9   A.      Correct.  Well, not through the promotional                10:56:27
10   process.  At the time -- at some point in there, he                10:56:31
11   had become a fire district chief.  That was his                    10:56:34
12   promotion.                                                         10:56:37
13   Q.      Correct.                                                   10:56:39
14   A.      His assignment to the fire marshal's office                10:56:39
15   was by appointment.                                                10:56:42
16   Q.      But you write that you deny that the transfer              10:56:48
17   was a promotion.                                                   10:56:52
18   A.      Correct.                                                   10:56:54
19   Q.      So Mr. Hutchison did not get promoted?                     10:56:57
20   A.      He got promoted to a fire district chief off               10:57:01
21   the fire operations district chief list which is more             10:57:04
22   money, but he became the fire marshal by appointment               10:57:08
23   and so that was a lateral move.                                    10:57:13
24   Q.      That was a lateral move --                                 10:57:16
25   A.      He didn't get any extra money when he was                  10:57:17
```

named the fire marshal.                                10:57:21

2    Q.      So he was initially named what?           10:57:22

3    A.      Fire district chief.  At some point, he was    10:57:25

4    named fire district chief.                          10:57:27

5    Q.      Fire district chief?                        10:57:29

6    A.      Uh-huh.                                     10:57:31

7    Q.      Was being named fire district chief a        10:57:34

8    promotion?                                          10:57:38

9    A.      That was, yes.                              10:57:38

10   Q.      So Mr. Hutchison was promoted to fire       10:57:40

11   district chief and then lateralled over to the fire    10:57:44

12   marshal?                                            10:57:48

13   A.      I think that's the order that it went.  He    10:57:48

14   could have been made the fire marshal by name as a    10:57:51

15   captain and then promoted district chief.  I'd have    10:57:55

16   to look back at the records to see which is          10:57:58

17   one (sic).                                          10:58:00

18   Q.      Would you agree that if Maggie was made --    10:58:00

19   had been made the fire marshal, it would have been a    10:58:07

20   promotion for her?                                  10:58:11

21   A.      She could have been named the fire marshal as    10:58:12

22   the fire marshal deputy.  He could have -- appoint    10:58:16

23   her as the fire marshal even though she still         10:58:20

24   permanently held that class as the district chief --    10:58:24

25   I mean as the deputy fire marshal.  Sorry.           10:58:28

1   Q.      So you disagree?

2   A.      If she got on a list -- I'm not disagreeing.

3   Rephrase your question so I make sure I answer it

4   right --

5   Q.      Okay.

6   A.      -- but I think I am.

7   Q.      Let me make it even easier.

8   A.      Okay.

9   Q.      It -- and I would think this was easy but

10  maybe I'm wrong.  Is the fire marshal a higher

11  position than deputy fire marshal?

12  A.      It is.

13  Q.      When someone moves from a lower position to a

14  higher position, is that the definition of a

15  promotion?

16  A.      If you come off of a list.

17  Q.      What if you don't come off of a list?

18  A.      Then you -- then it's not a promotion.  You

19  just get a new title and you keep everything the

20  same.  You keep every -- your title doesn't even

21  technically change.  On paper, on paper, Mr.

22  Hutchison's title was fire district chief as

23  appointed the fire marshal by the State -- Tennessee

24  Code Annotated regulations.  He could have done that

25  and still been a fire captain if Chief -- if that's

10:58:31
10:58:35
10:58:35
10:58:35
10:58:37
10:58:37
10:58:37
10:58:40
10:58:43
10:58:46
10:58:48
10:58:49
10:58:56
10:58:59
10:59:00
10:59:01
10:59:05
10:59:07
10:59:10
10:59:12
10:59:16
10:59:19
10:59:24
10:59:28

```
 1   what Chief wanted to do.                                    10:59:32
 2   Q.      You're the head of HR, correct?                      10:59:35
 3   A.      Here at the fire department, yes.                    10:59:37
 4   Q.      How many people work below you?                      10:59:38
 5   A.      Five.                                                10:59:42
 6   Q.      Who chooses who the head of HR is at the fire        10:59:44
 7   department?                                                  10:59:48
 8   A.      Chief Swann.                                         10:59:49
 9   Q.      Okay.  If -- and if Chief Swann for whatever         10:59:49
10   reason decided, hey, I don't want you to be the head        10:59:58
11   of HR anymore and then said you're gonna be not --          11:00:01
12   you're gonna be in HR but just not the head of HR.          11:00:05
13   A.      Sure.                                                11:00:08
14   Q.      And someone else in your department became          11:00:09
15   the head of HR, is that a promotion?                         11:00:11
16   A.      It would depend on who it was.  It depends on       11:00:13
17   if he assigned them -- so, in theory, he could take         11:00:18
18   Chief Hutchison and assign him to be my boss as a           11:00:23
19   district chief --                                           11:00:26
20   Q.      Okay.                                                11:00:26
21   A.      -- if that's what he wanted to do.                   11:00:26
22   Q.      Okay.  I guess what I should be asking you is       11:00:29
23   what -- define -- in your opinion or in your words          11:00:32
24   define promotion.                                            11:00:35
25   A.      Promotion means, from the fire department           11:00:36
```

```
 1  standpoint, you come off of a list, like a                    11:00:40
 2  register -- you know, we open it; you come off the            11:00:45
 3  list.  But, typically, by Metro HR, when we enter it          11:00:49
 4  into the system, if it results in an increase in pay,         11:00:54
 5  they call that a promotion on paper.  But you could           11:00:57
 6  get a new title and it's not necessarily a promotion          11:01:01
 7  if it's the same grade or within the same amount of           11:01:05
 8  money that your -- that your pay grade is.                     11:01:09
 9  Q.      Okay.  And I'm not -- I'm not trying to be             11:01:11
10  rude.  I'm looking up -- just the reason I pulled out         11:01:13
11  my phone is not to ignore you --                              11:01:16
12  A.      Sure.                                                 11:01:18
13  Q.      -- but it's to look up the Merriam-Webster            11:01:18
14  definition of the word promotion.                             11:01:22
15  A.      Okay.                                                 11:01:23
16  Q.      According to Merriam-Webster, at least, the           11:01:23
17  meaning of promotion is the act or fact of being              11:01:26
18  raised in position or rank.  Would you agree with             11:01:29
19  that definition?                                              11:01:33
20  A.      I would agree with that definition, but it's          11:01:35
21  not necessarily the -- Metro's definition of what a           11:01:38
22  promotion means.                                              11:01:40
23  Q.      Okay.  But you would agree with that                  11:01:41
24  definition?                                                   11:01:43
25  A.      I mean, it's the dictionary.  I'm not gonna           11:01:44
```

| | | |
|---|---|---|
| 1 | disagree with it. | 11:01:47 |
| 2 | Q.      That's fair.  If Maggie believed that going | 11:01:48 |
| 3 | from deputy fire marshal to fire marshal was a | 11:01:56 |
| 4 | promotion, could you understand why she would think | 11:02:05 |
| 5 | that would be a promotion? | 11:02:08 |
| 6 | A.      I could. | 11:02:09 |
| 7 | Q.      Okay.  Paragraph 53 states:  Chief Swann told | 11:02:09 |
| 8 | Ms. Lawrence in no uncertain terms that her age was | 11:02:40 |
| 9 | the reason she did not get the promotion.  Now, you | 11:02:43 |
| 10 | denied that, correct? | 11:02:47 |
| 11 | A.      Yes. | 11:02:48 |
| 12 | Q.      But you didn't even talk with Chief Swann | 11:02:49 |
| 13 | about that? | 11:02:52 |
| 14 | A.      I think we addressed it in the EEO complaint | 11:02:53 |
| 15 | and that's where I got the information for the | 11:02:56 |
| 16 | denial. | 11:02:59 |
| 17 | Q.      I thought you never met with Chief Swann | 11:02:59 |
| 18 | about the complaint. | 11:03:02 |
| 19 | A.      Not the complaint.  The EEO complaint; not | 11:03:03 |
| 20 | this complaint. | 11:03:07 |
| 21 | Q.      Okay.  Okay. | 11:03:08 |
| 22 | A.      And I also -- and I'd have to go back and | 11:03:12 |
| 23 | look, but I think there was a part of that recording | 11:03:15 |
| 24 | talked about -- and I'm not positive.  I'd have to go | 11:03:19 |
| 25 | back and look.  But that it wasn't about her age but | 11:03:22 |

| | | |
|---|---|---|
| 1 | said -- made a statement about -- I don't know.  I'm | 11:03:25 |
| 2 | not positive.  But I do think that I got that | 11:03:29 |
| 3 | information from the EEO complaint. | 11:03:33 |
| 4 | Q.      Paragraph 54 states:  He explained to her it | 11:03:35 |
| 5 | would not be smart of me to put someone in that | 11:03:40 |
| 6 | position.  At least -- I'm sorry -- not in that | 11:03:43 |
| 7 | position at that level and they not going to be here | 11:03:45 |
| 8 | but for a next few years.  And you denied that, | 11:03:49 |
| 9 | correct? | 11:03:56 |
| 10 | A.      That's what it says, yes. | 11:03:57 |
| 11 | Q.      Now, if there was audio evidence where he | 11:04:00 |
| 12 | actually stated that, it should have been admitted, | 11:04:06 |
| 13 | would you agree with that? | 11:04:09 |
| 14 | A.      I would. | 11:04:09 |
| 15 | Q.      Okay.  Now, if there were audio evidence that | 11:04:10 |
| 16 | backs that Chief Swann said to my client, well, | 11:04:19 |
| 17 | you're not gonna be here but for next few years, as | 11:04:23 |
| 18 | the head of HR, do you think that is something proper | 11:04:31 |
| 19 | to say? | 11:04:34 |
| 20 | A.      I think I would have to hear the whole | 11:04:36 |
| 21 | conversation and see what the context of the | 11:04:39 |
| 22 | conversation was before I would make an assessment on | 11:04:43 |
| 23 | it. | 11:04:46 |
| 24 | Q.      Explain that. | 11:04:46 |
| 25 | A.      Because I'm sure that the conversation was | 11:04:47 |

```
 1   more than just he said he was looking for somebody on          11:04:49
 2   the job for the next four to six years long after I'm          11:04:52
 3   gone.  I'm sure there was something that predicated            11:04:56
 4   it and went after it and so I would have to know what          11:04:59
 5   context that was taken in.  I would have to hear the           11:05:01
 6   whole conversation to know the context of it.                  11:05:05
 7   Q.      This is maybe a tough question, but I -- do            11:05:07
 8   you work for Chief Swann?                                      11:05:11
 9   A.      He is my boss.  I work for the fire                    11:05:13
10   department but he is who I report to, yes.                     11:05:16
11   Q.      Okay.  In the fire department, is there               11:05:19
12   anyone above Chief Swann?                                      11:05:31
13   A.      In the fire department, no.                           11:05:32
14   Q.      Assuming hypothetically Chief Swann said to           11:05:41
15   you something that you believed was discriminatory,           11:05:46
16   what would your -- what would -- do you have a duty           11:05:52
17   to report that?                                               11:05:55
18   A.      I would tell him that he, A, shouldn't say            11:05:57
19   things like that and, B, find out the context or the          11:06:01
20   whole reason of what it was said so...                        11:06:05
21   Q.      But do you have a duty to report it?                  11:06:09
22   A.      I would think I would report it if it was            11:06:12
23   something that was -- not everything -- you -- I              11:06:16
24   don't think you can just blatantly make one statement         11:06:20
25   discriminatory.  I think it has to be taken into              11:06:25
```

```
 1   context.  I think that I would have to know what the          11:06:28
 2   conversation was about.  But I also don't think Chief          11:06:30
 3   Swann's gonna do that but he could.  I don't -- I'm            11:06:34
 4   not saying he can't.  I'm not him.  But I think                11:06:38
 5   sometimes a lot of people say things just off the             11:06:40
 6   cuff that they may not necessarily believe or that            11:06:43
 7   someone may deem as hurtful.  But I don't know, A, if         11:06:45
 8   they're always illegal, or discriminatory, or violate        11:06:49
 9   EEOC.  I mean, I haven't been put in that situation           11:06:52
10   so.                                                           11:06:56
11   Q.      What if -- what if Chief Swann said to you --         11:06:56
12   hypothetically again, because I'm not saying he has.         11:06:56
13   But what if he had said to you, you know, no woman           11:07:00
14   should ever be a fire marshal, what would you do with        11:07:04
15   that?                                                        11:07:07
16   A.      Well, we would probably have a very long            11:07:08
17   argument about the reasons that, A, that's wrong and       11:07:10
18   he shouldn't say that, but, B, about how that women        11:07:13
19   in the workplace should be elevated and moved up.  I       11:07:17
20   mean, he and I have very open conversations.  And I'm      11:07:21
21   not one of those people that's just like a yes, sir.       11:07:21
22   My job is to tell him if I think he is making a            11:07:24
23   mistake, or doing something wrong, or why he               11:07:29
24   shouldn't do this, or why he can't do something            11:07:32
25   because the Civil Service rules require it.  And if I      11:07:36
```

```
 1   don't feel comfortable with doing it, I'm not gonna        11:07:40
 2   put my name on it and he knows that.                        11:07:41
 3   Q.      But what would you do?                              11:07:43
 4   A.      I have no idea.  I've never been put in that        11:07:45
 5   situation and I can't speculate what I would do.           11:07:49
 6   Q.      Okay.  You said one of your jobs is to tell        11:07:51
 7   him if he makes a mistake, correct?                        11:08:04
 8   A.      Yeah, advise him.  Well, I --                       11:08:07
 9   Q.      Advise him?                                        11:08:08
10   A.      It's my belief that he's made a mistake -- he      11:08:09
11   may think he's right.  But if I thought he was making     11:08:13
12   a making a mistake, I would say I think you're making     11:08:16
13   a mistake.                                                11:08:18
14   Q.      Have you ever told him that you think he's        11:08:18
15   making a mistake?                                         11:08:20
16   A.      I have.                                           11:08:21
17   Q.      Can you give me an example of --                   11:08:22
18   A.      I don't have an example.  But there's been        11:08:23
19   plenty of times that if I said -- I will make             11:08:27
20   statements that if I were gonna do this, I would do       11:08:27
21   it this way or I wouldn't do it that way.  But I          11:08:30
22   preface every one of those that I understand he's the     11:08:31
23   chief, and he's the boss, and he makes those              11:08:33
24   decisions, but if it were me, this is how I would go      11:08:36
25   about it.  I can't give you a specific example, but       11:08:40
```

| | | |
|---|---|---|
| 1 | that's not an uncommon conversation that we have. | 11:08:44 |
| 2 | It's happened before. | 11:08:47 |
| 3 | Q.     Can he fire you? | 11:08:47 |
| 4 | A.     Yes, he can. | 11:08:49 |
| 5 | Q.     On page -- I'm sorry.  Paragraph 57 states: | 11:09:20 |
| 6 | To add insult to injury, Chief Swann further | 11:09:24 |
| 7 | instructed Ms. Lawrence to give Mr. Hutchison | 11:09:27 |
| 8 | support, make sure if he -- if anything he needs or | 11:09:31 |
| 9 | whatever he needs you're here to support him.  And | 11:09:34 |
| 10 | you've admitted that the chief asked Maggie to | 11:09:40 |
| 11 | complete her job duties as an assistant fire marshal, | 11:09:45 |
| 12 | correct? | 11:09:48 |
| 13 | A.     Yeah.  That should have said deputy fire | 11:09:48 |
| 14 | marshal, by the way; not assistant. | 11:09:52 |
| 15 | Q.     What are you talking about? | 11:09:59 |
| 16 | A.     On the answer, number 57. | 11:10:01 |
| 17 | Q.     Oh, I'm sorry.  Your answer should have said | 11:10:03 |
| 18 | deputy -- | 11:10:05 |
| 19 | A.     Uh-huh. | 11:10:06 |
| 20 | Q.     -- fire marshal? | 11:10:06 |
| 21 | A.     Uh-huh. | 11:10:07 |
| 22 | Q.     Okay.  Paragraph 60 states that he | 11:10:07 |
| 23 | reminded -- he, being Chief Swann, reminded her, | 11:10:20 |
| 24 | being Maggie, that former Fire Marshal Thomas had | 11:10:24 |
| 25 | been terminated and suggested to her that it was | 11:10:27 |

```
 1   because he was not on board with the chief's          11:10:32
 2   succession plan.  And you denied that, correct?       11:10:35
 3   A.      Correct.                                       11:10:38
 4   Q.      Do you specifically remember talking with the 11:10:40
 5   chief about that?                                      11:10:43
 6   A.      I want to say that that was another one that  11:10:46
 7   was in her initial EEO complaint and so that's where  11:10:48
 8   I would have got that answer.                          11:10:55
 9   Q.      But you don't know it for sure?  You're       11:10:57
10   just -- that's just a guess?                           11:10:59
11   A.      I'm just guessing.                             11:11:00
12   Q.      Okay.  And I suppose the same could be said   11:11:01
13   with paragraph 61 -- with paragraph 61?               11:11:03
14   A.      Correct.                                       11:11:09
15   Q.      Okay.  Paragraph 65 states:  Less than one    11:11:34
16   month after filing her charge on October 8th, 2021,   11:11:37
17   Fire Marshal Hutchison put Ms. Lawrence on a          11:11:43
18   performance improvement plan, correct?                11:11:46
19   A.      Correct.                                       11:11:50
20   Q.      That was the first performance improvement    11:11:51
21   plan she's ever been put on; is that correct?         11:11:54
22   A.      Correct.                                       11:11:56
23   Q.      Okay.  Paragraph 67 states:  For example, Mr. 11:11:57
24   Hutchison said she was put on the PIP because she did 11:12:23
25   not assign a former employee's re-call duties to      11:12:26
```

```
 1  anyone even though she did.  And in your response,          11:12:32
 2  you admit that not reassigning re-call duties was          11:12:39
 3  listed, but you deny the other allegations; is that        11:12:43
 4  correct?                                                   11:12:50
 5  A.     I guess the other allegations is even though        11:12:50
 6  she did?                                                   11:12:55
 7  Q.     Yeah.  Did you look into whether she actually       11:12:55
 8  did or not?                                                11:12:59
 9  A.     I don't recall.                                     11:13:00
10  Q.     Okay.  Would you agree that you should have         11:13:00
11  looked into it since that is the allegation?               11:13:14
12  A.     I -- yes.                                           11:13:17
13  Q.     Okay.                                               11:13:19
14  A.     But I may have; I just don't remember.              11:13:20
15  Q.     Paragraph 68 states:  Mr. Hutchison also            11:13:30
16  explained that Ms. Lawrence approved overtime for          11:13:35
17  employees that should not have been approved even          11:13:39
18  though Mr. Hutchison, himself, approved the overtime       11:13:43
19  when Ms. Lawrence originally asked.  Did you look          11:13:47
20  into that or do you recall looking into that?              11:13:51
21  A.     I don't recall.                                     11:13:54
22  Q.     Okay.  But you will agree again that you            11:13:55
23  should have?                                               11:14:01
24  A.     Sure.                                               11:14:02
25  Q.     Okay.                                               11:14:02
```

|     |                                                                        |          |
|-----|------------------------------------------------------------------------|----------|
| 1   | A.      Yes.                                                           | 11:14:02 |
| 2   | Q.      Paragraph 69 states:  On November 6th, 2021,                   | 11:14:06 |
| 3   | Ms. Lawrence gave an interview to News 4 Nashville                     | 11:14:11 |
| 4   | about her allegations.  And the answer says                            | 11:14:15 |
| 5   | insufficient information to be able to admit or deny.                  | 11:14:22 |
| 6   | And my guess is that's -- you just don't know when                     | 11:14:26 |
| 7   | the interview was given.  Is that fair?                                | 11:14:30 |
| 8   | A.      Correct.                                                       | 11:14:32 |
| 9   | Q.      Okay.  And it talks at -- paragraph 70 states                  | 11:14:33 |
| 10  | that the reporter, Jeremy Finley, did a story on all                   | 11:14:39 |
| 11  | the African American women who have filed charges of                   | 11:14:43 |
| 12  | discrimination against the Nashville Fire Department.                  | 11:14:46 |
| 13  | And your answer is admitted that there was a news                      | 11:14:51 |
| 14  | story done by reporter Jeremy Finley.  All other                       | 11:14:57 |
| 15  | allegations are denied.  Did you ever watch that                       | 11:15:01 |
| 16  | story?                                                                 | 11:15:05 |
| 17  | A.      I did.                                                         | 11:15:05 |
| 18  | Q.      Okay.  So if you watched that story, you                       | 11:15:06 |
| 19  | would have learned that he, Jeremy Finley, addressed                   | 11:15:09 |
| 20  | other charges of discrimination that were filed                        | 11:15:16 |
| 21  | against the Nashville Fire Department, correct?                        | 11:15:20 |
| 22  | A.      Correct.                                                       | 11:15:22 |
| 23  | Q.      Okay.  So why did you deny that?                               | 11:15:23 |
| 24  | A.      Because it said on all the African American                    | 11:15:26 |
| 25  | women who have filed charges of discrimination.  And                   | 11:15:30 |

```
1    I don't know that in all the people listed that        11:15:33
2    actually filed discrimination charges.  They may have  11:15:38
3    filed complaints.  They may have -- and I -- and       11:15:41
4    there may have been more.  I don't know.  I'm          11:15:44
5    assuming that's what the response to that answer is    11:15:46
6    for.  I'm just guessing.                               11:15:50
7           But, I don't know, that -- that just isn't an   11:15:51
8    accurate representation of what the story was about,   11:15:54
9    the news story.  I would have to go back and watch     11:15:56
10   the story again and see who all was in there.          11:16:02
11   Because I remember thinking we had issues that --      11:16:05
12   some people filing a complaint of discrimination and   11:16:08
13   -- or filing charges of discrimination and just doing  11:16:11
14   investigations or complaints; not necessarily had to   11:16:14
15   do about race so.                                      11:16:16
16   Q.     Okay.  The -- well, it doesn't say race,        11:16:18
17   though, to be fair.  It just says who have filed       11:16:22
18   charges of discrimination, correct?                    11:16:25
19   A.     Correct.  I was just going off of the           11:16:26
20   previous part where it says on all African American    11:16:29
21   women so assuming it was race.                         11:16:31
22   Q.     Okay.                                           11:16:32
23   A.     Yeah.                                           11:16:32
24   Q.     The story actually posted pictures of three     11:16:34
25   other women, correct?                                  11:16:39
```

| | | |
|---|---|---|
| 1 | A.      I think so. | 11:16:40 |
| 2 | Q.      And one is Drusilla Martin? | 11:16:41 |
| 3 | A.      Correct. | 11:16:45 |
| 4 | Q.      Do you know Ms. Martin? | 11:16:45 |
| 5 | A.      I do. | 11:16:47 |
| 6 | Q.      And who is Ms. Martin? | 11:16:48 |
| 7 | A.      She is the -- one of the finance managers | 11:16:50 |
| 8 | here at the department who's assigned to OEM to do | 11:16:53 |
| 9 | the budget at the Office of Emergency Management -- | 11:16:56 |
| 10 | Q.      And -- | 11:16:59 |
| 11 | A.      -- and all finances. | 11:16:59 |
| 12 | Q.      -- did she file any sort of complaint against | 11:16:59 |
| 13 | the department? | 11:17:03 |
| 14 | A.      I know she has filed -- she has lodged | 11:17:04 |
| 15 | complaints.  I don't recall that she has filed | 11:17:07 |
| 16 | official complaints through the EEOC or filed charges | 11:17:09 |
| 17 | through the EEOC. | 11:17:15 |
| 18 | Q.      You don't know? | 11:17:17 |
| 19 | A.      I don't know. | 11:17:19 |
| 20 | Q.      Okay.  Do you know if she's still working | 11:17:19 |
| 21 | here? | 11:17:21 |
| 22 | A.      She is. | 11:17:22 |
| 23 | Q.      Do you know what any of her complaints are? | 11:17:22 |
| 24 | A.      One of her complaints -- and I -- I would | 11:17:24 |
| 25 | just be guessing.  I don't want to guess but I -- I | 11:17:29 |

```
 1    just -- I can't remember.  But I know that we've had          11:17:34
 2    them.  I believe she's filed -- I know she's filed            11:17:37
 3    complaints.  I just don't recall if she went to the           11:17:38
 4    EEOC or not.                                                  11:17:42
 5    Q.     Okay.  Would you have copies of all that if            11:17:45
 6    she did?                                                      11:17:48
 7    A.     Yes.                                                   11:17:48
 8    Q.     Okay.                                                  11:17:49
 9           MR. BIGELOW:  I'll probably follow up                  11:17:49
10    with that, Ben.                                               11:17:51
11    BY MR. BIGELOW:                                               11:17:52
12    Q.     What about Quinetta Bartley?                           11:17:53
13    A.     I'd have to go back and look.  I don't                 11:17:57
14    remember if she filed -- Quinetta was demoted and             11:18:00
15    then ultimately -- temporarily and then ultimately            11:18:04
16    permanently demoted.  I would -- and I'd have to              11:18:07
17    look.                                                         11:18:10
18    Q.     Okay.  Now, she was the former deputy fire             11:18:11
19    marshal?                                                      11:18:14
20    A.     She was.                                               11:18:14
21    Q.     And she was demoted?                                   11:18:14
22    A.     Correct.                                               11:18:16
23    Q.     Okay.  Do you know why she was demoted?                11:18:17
24    A.     Al Thomas brought her up on charges for                11:18:19
25    deficient and insufficient performance of duties and          11:18:21
```

| | | |
|---|---|---|
| 1 | a host of other Civil Service violations related to | 11:18:25 |
| 2 | her performance in her job. | 11:18:29 |
| 3 | Q.     What about Shelle Braden? | 11:18:31 |
| 4 | A.     Yes, I know Shelle. | 11:18:34 |
| 5 | Q.     Okay.  Tell me about Shelle. | 11:18:35 |
| 6 | A.     Shelle was a paramedic here.  She is -- no | 11:18:36 |
| 7 | longer works here.  She is a -- she is on her | 11:18:38 |
| 8 | disability pension, OID disability pension.  And | 11:18:43 |
| 9 | she's probably filed six complaints with the EEOC and | 11:18:46 |
| 10 | filed lawsuits against the department for a multitude | 11:18:54 |
| 11 | of reasons, but she never followed through with any | 11:18:56 |
| 12 | of them. | 11:19:01 |
| 13 | Q.     Since you have been the head of HR for the | 11:19:01 |
| 14 | Metro fire department, do you have any idea how many | 11:19:04 |
| 15 | complaints of discrimination have been filed? | 11:19:09 |
| 16 | A.     Any kind of discrimination? | 11:19:10 |
| 17 | Q.     Yeah. | 11:19:11 |
| 18 | A.     Maybe 10, 12. | 11:19:13 |
| 19 | Q.     Have you -- and when they're filed, is it | 11:19:15 |
| 20 | your duty to investigate them? | 11:19:20 |
| 21 | A.     Usually when they're filed, they go to Metro | 11:19:22 |
| 22 | Legal and then I will help form the answer or the | 11:19:25 |
| 23 | response to the questions -- or to the charges from | 11:19:28 |
| 24 | the EEOC. | 11:19:31 |
| 25 | Q.     Okay.  Have you ever -- in helping form the | 11:19:32 |

```
 1    answers, have you ever admitted to any fault on            11:19:37
 2    behalf of the fire department?                             11:19:42
 3    A.      I don't recall.  Admitted?                         11:19:46
 4    Q.      Yeah.  Like have you ever found that the           11:19:48
 5    charges or complaints of discrimination were, in           11:19:51
 6    fact, true?  Have you ever said, yeah, that's true,        11:19:56
 7    we did that?                                               11:19:59
 8    A.      We have stated that, yes, we did that but not      11:20:00
 9    necessarily in the -- so in the response, there may        11:20:04
10    be a question that says, yes, we did that, but, no,        11:20:08
11    it's not discrimination and here's why or -- and in        11:20:11
12    all those, we've only had one -- one of the                11:20:15
13    complaints that I can recall that we actually had a        11:20:19
14    follow up from the EEOC and it was -- it was fairly        11:20:21
15    recent.                                                    11:20:24
16    Q.      Well, let me -- let me state that                  11:20:24
17    differently.  In response to any allegations of           11:20:28
18    discrimination, have you as the head of HR stated,        11:20:35
19    yes, we did discriminate against this person?             11:20:39
20    A.      Not that I can recall.                            11:20:44
21    Q.      Okay.  Do you know Joshua Lipscomb?              11:20:45
22    A.      I do.                                             11:20:58
23    Q.      And how do you know him?                         11:20:59
24    A.      He was one of our former firefighters here at    11:21:01
25    the Nashville Fire Department.                            11:21:04
```

```
 1    Q.      And did he end up filing a complaint?          11:21:06
 2    A.      He filed a lawsuit.                            11:21:11
 3    Q.      He filed a lawsuit?                            11:21:12
 4    A.      Uh-huh.                                        11:21:14
 5    Q.      Okay.  And what were the allegations in that   11:21:14
 6    lawsuit?                                               11:21:18
 7    A.      Free speech.                                   11:21:19
 8    Q.      Okay.                                          11:21:20
 9    A.      Social media.                                  11:21:21
10    Q.      And he filed it because he had received a      11:21:23
11    16-day suspension; is that correct?                    11:21:28
12    A.      Correct.                                       11:21:31
13    Q.      And ultimately, there was a settlement -- I    11:21:32
14    guess a settlement out of court maybe?                 11:21:36
15    A.      Correct, we settled prior to going to court.   11:21:38
16    Q.      For $450,000?                                  11:21:42
17    A.      Well, it was -- for him, it was for three      11:21:43
18    years of his salary had he kept working here and       11:21:45
19    attorney's fees that totalled somewhere around         11:21:46
20    $450,000, yes.                                         11:21:50
21    Q.      Combined --                                    11:21:51
22    A.      Uh-huh.                                        11:21:53
23    Q.      -- both combined?                              11:21:53
24            Okay.  Did you ever monitor his social media   11:21:59
25    accounts?                                              11:22:01
```

```
 1   A.      I said in my deposition then, and I'll say it      11:22:03
 2   today, that I did not monitor his social media.  Yes,      11:22:07
 3   I looked at his social media, but I did not monitor        11:22:10
 4   his social media.                                          11:22:13
 5   Q.      Okay.  What's the difference between looked        11:22:15
 6   at and monitored?                                          11:22:23
 7   A.      I think monitoring means that you're              11:22:24
 8   continually just sitting there waiting to get them on      11:22:26
 9   something.  And in his case, he left it wide open so       11:22:30
10   I looked at it.                                            11:22:35
11   Q.      Okay.                                              11:22:36
12   A.      Yeah.                                              11:22:36
13   Q.      When claims are brought against the fire           11:22:43
14   department, whether discrimination or, as in Mr.           11:22:50
15   Lipscomb's case, first amendment claims, do you ever       11:22:55
16   look at social media accounts of the people that are       11:23:07
17   bringing the claims?                                       11:23:10
18   A.      I have.                                            11:23:11
19   Q.      Okay.                                              11:23:12
20   A.      But I don't -- I don't have Facebook so I          11:23:12
21   can't look at that, so sometimes Joseph does or other      11:23:15
22   people will bring it to my attention.                      11:23:19
23   Q.      Who's Joseph?                                      11:23:21
24   A.      Joseph Pleasant, our PIO.                          11:23:23
25   Q.      Joseph?                                            11:23:26
```

Case 3:22-cv-00680    Document 23-3    Filed 08/30/23    Page 112 of 117 PageID #: 278

| | | |
|---|---|---|
| 1 | A.    Pleasant. | 11:23:27 |
| 2 | Q.    Pleasant? | 11:23:28 |
| 3 | A.    Our PIO. | 11:23:30 |
| 4 | Q.    What's a PIO? | 11:23:31 |
| 5 | A.    Public information officer. | 11:23:32 |
| 6 | Q.    Okay.  So sometimes either he or you will | 11:23:34 |
| 7 | like look into -- | 11:23:36 |
| 8 | A.    Well, he'll -- if it's on Facebook or | 11:23:37 |
| 9 | something and it's alleged, that's how it usually | 11:23:39 |
| 10 | gets to me. | 11:23:43 |
| 11 | Q.    Okay. | 11:23:43 |
| 12 | A.    I don't usually have any information | 11:23:43 |
| 13 | regarding Facebook complaints like that unless | 11:23:47 |
| 14 | they're brought to me; either by one of the chiefs | 11:23:49 |
| 15 | might text them a screenshot of something.  You know, | 11:23:50 |
| 16 | there's a host of different ways it can occur but... | 11:23:54 |
| 17 | Q.    Okay.  Did you ever look into any of Ms. | 11:23:56 |
| 18 | Lawrence's accounts or anything like that? | 11:24:00 |
| 19 | A.    Not that I recall.  Just she -- unless she | 11:24:01 |
| 20 | has Instagram.  I only have Instagram but I don't | 11:24:03 |
| 21 | think I did. | 11:24:06 |
| 22 | Q.    Do you know or are you just guessing? | 11:24:07 |
| 23 | A.    I'm not -- I don't want to sit here and say | 11:24:09 |
| 24 | that I've never looked at it, but I don't recall ever | 11:24:12 |
| 25 | looking at it. | 11:24:15 |

```
 1   Q.      Okay.  Do you ever look into people's e-mails      11:24:16

 2   like within the department?  Is that part of your         11:24:26

 3   job?                                                       11:24:30

 4   A.      No.                                                11:24:30

 5   Q.      So --                                              11:24:30

 6   A.      We have -- when people leave, like Al Thomas,      11:24:32

 7   we will capture their e-mail box and -- or their          11:24:35

 8   folder and hold it so that we can look at it like if      11:24:38

 9   we need old e-mails about an ongoing project or           11:24:43

10   something like but not since anyone that -- anyone        11:24:46

11   that works here.  We'd have to -- I can't -- I can't      11:24:49

12   just go look in anybody's e-mail.  We would have to       11:24:50

13   get access from the IT department to do that.             11:24:54

14   Q.      Okay.  So you don't have the ability to           11:24:56

15   just --                                                   11:24:58

16   A.      No.                                               11:24:58

17   Q.      -- search yourself someone's e-mails or --        11:24:58

18   A.      No, no, no.                                       11:25:02

19   Q.      Okay.                                             11:25:05

20           MR. BIGELOW:  Let's just do this, let's           11:25:09

21   just take -- what time is it?                             11:25:09

22                MR. PUCKETT:  11:25.                          11:25:09

23           MR. BIGELOW:  Let's just take a                   11:25:15

24   five-minute break.  And then I highly doubt we'll go      11:25:15

25   more than 15 more minutes and we may go zero more         11:25:19
```

```
 1    minutes.  But let's just take a five-minute break and          11:25:24
 2    we'll go from there.                                           11:25:28
 3                    THE WITNESS:  Okay.                            11:25:32
 4                    (Short break.)                                 11:25:32
 5    BY MR. BIGELOW:                                                11:25:32
 6    Q.      Let's get on the record just for a few more           11:32:10
 7    minutes and then I'll let you go.                             11:32:13
 8    A.      Okay.                                                  11:32:15
 9    Q.      Earlier, you testified that you have known            11:32:15
10    Maggie for a couple of decades.                               11:32:19
11    A.      Yes.                                                   11:32:21
12    Q.      Is that true?                                         11:32:21
13    A.      True.                                                  11:32:22
14    Q.      And you get along with her?                           11:32:23
15    A.      I do.                                                  11:32:24
16    Q.      Okay.  Have you ever known her to lie about           11:32:25
17    anything?                                                      11:32:29
18    A.      Not that I'm aware of.                                 11:32:30
19    Q.      Okay.  In your 20 years around or so of               11:32:31
20    knowing her, do you think that she's a truthful              11:32:42
21    person?                                                        11:32:45
22    A.      I would say so, yes.                                   11:32:45
23    Q.      Okay.  I have no further questions.  Thank            11:32:47
24    you for your time.                                            11:32:50
25    A.      Thank you.                                             11:32:51
```

1   MR. PUCKETT:  No questions.

2      FURTHER DEPONENT SAITH NOT

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    REPORTER'S CERTIFICATE

 2

 3    STATE OF TENNESSEE

 4    COUNTY OF DAVIDSON

 5          I, SARAH N. LINDER, Licensed Court Reporter,

 6    with offices in Nashville, Tennessee, hereby certify

 7    that I reported the foregoing deposition of JAMIE

 8    SUMMERS by machine shorthand to the best of my skills

 9    and abilities, and thereafter the same was reduced to

10    typewritten form by me.

11          I further certify that I am not related to

12    any of the parties named herein, nor their counsel,

13    and have no interest, financial or otherwise, in the

14    outcome of the proceedings.

15          I further certify that in order for this
      document to be considered a true and correct copy, it
16    must bear my original signature and that any
      unauthorized reproduction in whole or in part and/or
17    transfer of this document is not authorized, will not
      be considered authentic, and will be in violation of
18    Tennessee Code Annotated 39-14-104, Theft of
      Services.

19

20

21

22    SARAH N. LINDER, LCR
      Licensed Court Reporter (TN)
23    Notary Public State of Tennessee

24    My Notary Commission Expires:  3/6/2024
      LCR #153 - Expires:  6/30/2024
25
```